# FLORENCE B. O'HERN, Respondent, v. JOHN J. O'HERN, Appellant.

### Kansas City Court of Appeals, March 7, 1921.

1. **DIVORCE: Finding on Question of Indignities Governed by Facts in each case.** The statute fails to define indignities, and the question must, therefore, be governed largely by the facts in each individual case.

2. ————: **Appellate Court Must Form its Own Conclusions as to the Merits.** While in actions for divorce the appellate court will defer largely to the conclusions of trial judge it must not neglect its duty of forming its own conclusions as to merits.

3. ————: **Burden of Proof on Plainitff to Support Allegation of Indignities.** Where plaintiff's petition alleged indignities such as to render her condition intolerable, the burden was on plaintiff to prove the allegation to the satisfaction of the court.

4. ————: **Desertion not Indignity: Under Statute, if for Period of One Year, Ground of Divorce.** Desertion is not an indignity, but is, in itself, if for a period of one year, a ground for divorce under section 2370, Revised Statutes 1909.

5. ————: **Indignities: May Consist of Species of Mental Cruelty.** Indignities contemplated by divorce law consist of unmerited, contemptuous conduct, or any act which manifests contempt, incivility, or injury accompanied with insult amounting to a species of mental cruelty.

6. ————: ————: **Acts of Mental Torture and Cruelty are Indignities.** Where the evidence showed defendant abandoned plaintiff without just cause, stated that he did not love her, intimated to her and friends that she had been guilty of wrongful and improper conduct, without naming it, justifying his abandonment of her, publication in newspaper he would not be responsible for her debts, when she had not contracted any, and his refusal to return to her in spite of her earnest efforts to become reunited, are acts of mental torture and cruelty, constituting indignities, entitling plaintiff to divorce.

7. ————: **Alimony and Counsel Fees not Excessive.** Where evidence showed defendant was a man of vigor and good business ability,

earning large sums of money in his business, an allowance of $100 per month permanent alimony, and $150 attorneys fees for the prosecution of the case, which required three days for the trial, and $100 for maintenance and support, pending appeal, $150 attorney's fees and $25 for cost of printing briefs was not excessive.

Appeal from the Circuit Court of Jackson County.—*Hon. Clarence A. Burney*, Judge.

AFFIRMED.

*Haff, Meservey, German & Michaels* for respondent.

*Goodwin Creason* for appellant.

ARNOLD, J.—This action is for divorce instituted by the wife. The petition filed July 7, 1919, in the circuit court of Jackson county, Missouri, at Kansas City, alleges that plaintiff and defendant were lawfully married in Jackson county, Missouri, August 3, 1916, and lived together as husband and wife until on or about March 15, 1919, and that no children have been born of said marriage.

The grounds on which plaintiff seeks a divorce from her husband are that defendant has been guilty of such conduct as to constitute him a vagrant within the meaning of the law respecting vagrants, and that defendant has been guilty of such indignities as to render plaintiff's condition intolerable. The petition further recites that defendant has committed adultery while living with plaintiff as her husband. Plaintiff also alleges that defendant is possessed of real and personal estate of the estimated value of $30,000. The prayer is for divorce and an allowance for support and maintenance for such time as the nature of the case may require, and for restoration of plaintiff's maiden name.

Defendant's answer admits the marriage and denies the other allegations in the petition and prays that the petition for divorce be denied. The decree and judgment of the trial court were in favor of plaintiff, granting her

a divorce and adjudging that plaintiff is entitled to all of her interest in defendant's community property owned and held in the name of the defendant in the State of Texas, and adjudging her the further sum of $100 per month for alimony, commencing November 1, 1919, together with $150 as attorney fees for the prosecution of the case. Defendant's motions for a new trial and in arrest of judgment were overruled and defendant appeals, said cause being designated in this court as No. 13837.

Plaintiff thereupon filed her motion for alimony *pendente lite* on appeal which the court sustained and defendant was ordered to pay plaintiff the sum of $150 attorney fees in the appellate court, $100 per month maintenance and support pending appeal, and $25 for costs of printing brief in appellate court. From said action and order of the court defendant appeals and said appeal is designated on the docket of this court as No. 13838. As the divorce case embraces all the facts in the latter case, they will be considered together.

Reading the whole testimony in the case and giving it the consideration we are bound to do, we are of the opinion that plaintiff made out a case entitling her to a decree. Plaintiff's case is bottomed upon allegations of (1) vagrancy, (2) indignities and (3) adultery. The trial court, in a memorandum of conclusions declares that he "finds that the evidence is not sufficient to justify a finding that the defendant is guilty of adultery, but that the allegations in plaintiff's petition are true in that defendant has offered such indignities as to render her condition intolerable; that plaintiff is the injured and innocent party and entitled to the relief prayed."

The trial was held on October 7, 8 and 9, 1919. The testimony of plaintiff tends to show that she and defendant were married August 3, 1916 and lived together two years and seven months; that until November, 1918, everything ran smoothly; that about the last of November, the defendant "intimated to me for the first time

that things were not right between us, that he did not love me any more," and gave as his reason for his statement that "I did not love him, and never did love him."

From that time, the parties ceased to have marital relations, but lived together until about the last of February, or first of March, 1919. Defendant then went to Fort Worth, Texas, and engaged in the business of a broker of oil land leases. Then began a correspondence between plaintiff and defendant. Plaintiff kept copies of letters she wrote to defendant and these copies and defendant's original letters were introduced in evidence.

On March 4th, plaintiff wrote defendant asking why he was so depressed in spirit and unfair to her, that she loved him; that she would come to Fort Worth and live with him. He answered by letter March 9th, enclosing a check for $20 to pay their board bill, and stated, "I am sorry, more so than I can say, that things have turned out as they have, but I cannot help it." He further stated that he would be in Kansas City about March 14th, and would see her. He did come back about that time and saw her a day or two afterwards, but nothing was said about his reason for leaving her; that upon her inquiry as to what he meant, he answered "Nothing, go back and peddle your insurance."

It appears that plaintiff, at the time of her marriage to defendant, had been engaged as a solicitor for automobile insurance and that defendant had been a speculator in live stock at the Kansas City Stock Yards, for many years. Plaintiff states that she again wrote defendant on March 25th, urging him to come back to her, or let her come to Fort Worth. In a copy of her letter to him of April 4, 1919, she states that she wants him to come to see her when he comes to Kansas City, "unless you have some other woman that is causing you to desert me." In a letter to him of April 2d, she asked him to write to her about what he proposed to do for her maintenance. He answered, returning some deeds that she sent him for his signature and accused her

of refusing to speak to him at the Stock Yards in Kansas City. Plaintiff denied having seen defendant on the occasion referred to.

May 12th, plaintiff writes stating that if there is no other woman in the case, he should tell her so, and not attempt to make other people believe that she had been guilty of some unnamed crime or misdeed. Plaintiff next saw defendant at the Baltimore Hotel in Kansas City in June, when a conversation occurred between them in which defendant accused plaintiff of having talked about his character. Plaintiff states that she had made investigations into the life defendant was leading. She asked him about several things which he denied. and defendant stated: "I was true to you as long as I lived with you, but will not say as to my attitude since." Defendant denies this statement.

Again she saw defendant, about a month before the trial began, at which time "he told me that I did not know anything and that I had been misled, and I told him that I positively knew some things that were sufficient for me to get a divorce." Then he said that a young lady whose name he mentioned was the only person who could do him any harm. Plaintiff went to Fort Worth and states that she learned that the young lady mentioned had spent a month and a half down there; that she saw pictures of the young woman and the defendant taken in his car; that she secured these pictures from a suit of rooms furnished by the Franklin Oil Company, in whose employ defendant was. That he occupied one of the rooms and that some of the pictures were taken in that suit. These kodak pictures were introduced in evidence by plaintiff and are reproduced in the record. Plaintiff also introduced in evidence an apron which she got from defendant's boat house at Lake Worth near Fort Worth, Texas. Plaintiff identified this apron as being worn by said young lady, as shown in some of the pictures introduced in evidence.

Plaintiff also introduced in evidence a clipping from the Kansas City Star, in which defendant stated that

he would not be responsible for debts contracted by plaintiff. This notice was of date July 9 and 10, 1918.

Plaintiff states that defendant paid living expenses while he lived with her, an average of $147 per month, and that she worked at insurance and paid whatever balance was necessary for living expenses; that she earned about $50 per month and that it was agreed between plaintiff and defendant prior to their marriage that she should do this work until she got her mother and sister in a position to take care of themselves; that when defendant told her he did not love her she sold out her insurance business, thinking that continuance in the business might be the cause of defendant's abandonment of her.

The parties spent six weeks on a wedding trip in Florida and Cuba, then lived in an apartment at Linwood Boulevard and Chestnut street, then moved to 3744 Washington street, boarding until August; then moved to the Rossington apartments, then to the Buckingham Hotel, where they remained until March, 1919, when the final separation occurred. Plaintiff states that at that time defendant took his personal belongings and left and that he left with plaintiff an automobile that had cost $750; that defendant's income was $10,000 a year after he got into the oil business and before that it was $150 per month while he was in the serum business and a third share in the profits of the business. Plaintiff states that defendant was a genial, jovial and considerate man towards her up to the last of November, 1918; that up to this time, their relations were congenial and friendly; that he was liberal with his money and was always with her at night when in the city.

Defendant testified that when he was married to plaintiff he was speculating in the stock yards, and was in the hog cholera serum business; that plaintiff continued in the insurance business and spent a day or two at the stock yards each week soliciting insurance from his friends and acquaintances, to his annoyance and chagrin; that there had been an agreement between the

parties that as soon as his friends at the stock yards found out they were married, she would quit conducting her business down there; that about six months after their marriage his friends found out that plaintiff was his wife and that this fact made it unpleasant for him; that he told her she would have to quit down there, or he would; that she said "Go ahead and quit; this is the best business I've got." Defendant then quit the stock yards and entered the oil business.

Defendant also complains that his mother-in-law was a vendor of corsets and that she plied her trade among the women clerks and stenographers there, much to his annoyance. Defendant states: "The great reason I quit living with my wife is because she would not make me a home and was not domestic. She was a business woman. A good deal of the time she was cross. She did not like my mother and father. I suggested having my mother visit us awhile. She protested and said that my mother could not come; and that she did not want to meet her. I asked her why. She said neither my mother nor father were good enough for her to meet. She said that if I were of a higher breed than I was that we would get along better, that she was above me, and that was the reason why things were not as congenial as they might be. She saw my father very often in Kansas City. She never invited him out to our home. He and I have been the best of pals during the last 12 or 14 years since I got him cured of the drink habit." Further defendant testified that when they lived at the Rossington apartments, he cooked his own meals at times; that his wife did not want to keep house.

Plaintiff testified that after the separation she saw defendant at a picture show holding the hand of his lady companion and, later, saw him driving on the boulevards with this same woman (whom she afterwards learned was one Maud Goldsberry of Chicago); that he had his arm around her, and was hugging, kissing and drawing her to him. Defendant states that this person was his

sister, Della Berry, who lived in Chicago, and denies the affectionate exhibitions.

A careful reading of the voluminous record in this case discloses, in the opinion of this court, evidence of sufficient importance and magnitude upon which to base a finding on the question of indignities. The statute fails to define indignities and the question must therefore be governed largely by the facts in each individual case. "It is impossible, therefore, under the statute to specify particular acts as the indignities for which divorces may, in all cases, be granted; for it is not possible to state the effect of such acts in rendering the condition of all persons injured intolerable." [Hooper v. Hooper, 19 Mo. l. c. 357; Scholl v. Scholl, 194 Mo. App. l. c. 566.]

While in a divorce suit this court, on appeal, will defer largely to the conclusions arrived at by the trial judge, it must not neglect its duty of forming its own conclusions as to the merits of each particular controversy.

Plaintiff's petition alleges indignities such as to render her condition intolerable in this, "that he has without just reason or cause, abandoned this plaintiff, stating that he does not love her, intimating that she has been guilty of some conduct, not naming it, which justified him in leaving her, and telling the intimate friends of this plaintiff that plaintiff has been guilty of such wrongful and improper conduct as to justify him in leaving her." The burden is on plaintiff to prove the allegation to the satisfaction of the court, which she seems to have done. Desertion is not an indignity but is, in itself, if for a period of one year, a ground for divorce. [Sec. 2370, Rev. Stat. 1909.]

"Indignities contemplated by the divorce law as authorizing a decree of separation consist of unmerited contemptuous conduct; any act towards another which manifests contempt for him, contumely, incivility, or injury accompanied with insult and amounting to a species

of cruelty to the mind.'' [Lynch v. Lynch, 87 Mo. App. 32.]

Indignities may consist of a species of mental cruelty such as to render plaintiff's condition intolerable. ''For an indignity to be intolerable in a statutory sense it must amount to a species of mental cruelty.'' [Holschbach v. Holschbach, 134 Mo. App. l. c. 257; Goodman v. Goodman, 80 Mo. App. 274; Scholl v. Scholl, supra; Hooper v. Hooper, supra.]

By a careful reading of this evidence, we arrive at the conclusion that from the month of November, 1919, defendant was determined to get rid of his wife, and from that time on, his acts were directed to that end.

Plaintiff seems to have done everything in her power to regain her husband's love and to procure his return to her. This is shown clearly in the pathetic letters addressed to him. His refusal to continue the marital relations with her, his accusation that she did not love him, his sudden abandonment of her without explanation, his publication in a newspaper having a wide circulation in Kansas City that he would not be responsible for his wife's debts, when there was no proof that any bills of hers had been presented to him, and naming her in the advertisement, are acts of mental torture and cruelty which, in the opinion of this court, constitute indignities. Plaintiff's letters, written in an endeavor to become reunited with her husband, are speaking evidences of this fact.

Defendant makes much of the contents of part of a mutilated letter written by plaintiff to her sister, introduced in evidence, and which plaintiff admits writing, in which the following language occurs: ''It is my one aim now to make him the happy light hearted boy he used to be. Dear, I had taken all the heart and gayness out of him and if he had not loved me everything would have been over long ago. I had wrecked his life and now, I must bring him back. I suffered as you know, but did not begin to as he has. He has given up everything for me and I selfishly could not see it and

now I have come to my senses and health I see it all, and dear, knowing what I know I can never be impatient and ugly any more. His love, together with your good sense has made me over and well, all I can think now is love and kindness and we will all be one happy family from now on.''

We do not attach any importance to this letter as a confession of guilt in any sense, but take it rather as an expression of a despairing heart to assume all blame in order to induce her husband to return to her. Other letters breathe this same note of despair and pleadings to be allowed to assume her place with her husband.

It will not be necessary to set out all of these letters, but one in point, dated March 25, 1919, (after the separation) will suffice: ''My dearest Boy: Notwithstanding all that you have said I cannot believe that you have really decided to leave me. My faith in you has been perfect and perhaps that is the reason why you have drifted away from me. However, I still believe you mean to be good and true and that your better nature and judgment will bring you back to me. No matter what you have done or are doing it will not change my love for you and I am waiting for you. I have loved you so much, but for sometime I have felt that there was some strong influence working against me, but as much as I have wanted and tried to make you happy that influence has robbed all my efforts and made me sick and anxious, at the same time causing you to misinterpret and misunderstand my love. Wont you tell me what this influence is and why you have changed so suddenly? Dear I want to be with you & I wish you would let me come to Ft. Worth, as I have always wanted to and be the wife to you that I have always wanted to be.

''I will do all in my power to secure our happiness and dearest you are going to be happier if you will only give me a fair chance. Our happiness lies entirely with you to do with it as you please.

Lovingly,

Mar. 25th.                                    FLORENCE.''

O'Hern v. O'Hern.

No reply was received from this letter.

Defendant's letters in reply to these appeals will not be set out here; but we note that they do not breathe the spirit of reconciliation shown by plaintiff's epistles.

In this view of the case we must conclude that the trial court was correct in his estimate of the evidence and his finding as to the decree will not be disturbed.

Defendant complains that the court erred in sustaining plaintiff's motion for alimony *pendente lite* on appeal. He is shown to have been a man of vigor and of good business ability who earned large sums of money in his business. "The allowance of permanent alimony is a matter of sound judicial discretion, to be exercised with reference to established principles and upon a view of the circumstances of each particular case, such as the estate and ability of the husband, the condition and means of his wife, and the conduct of the parties." [Viertel v. Viertel, 212 Mo. 1. c. 575; Vordick v. Vordick, 226 S. W. 59.]

In our opinion the allowance of $150 attorney fees for the prosecution of the cause was not excessive, when we consider that it required three days for the trial; and that the allowance of $100 per month alimony, commencing November 1, 1919, is not excessive. And in this conclusion we are not unmindful of the fact that plaintiff owns and has the income from a small piece of mortgaged property and that she is capable of earning something as an insurance solicitor. In this connection, we are also mindful of the reduced purchasing power of a dollar at this period of our national existence.

The same conclusion, of course, applies to case No. 13838, relating to the appeal from the allowance of alimony *pendente lite,* on appeal, to-wit, $100 per month for maintenance and support pending appeal, $150 attorney fees and $25 for cost of printing briefs in appellate court.

The judgment of the trial court in both cases is affirmed, as to the decree of divorce, permanent alimony, attorney fees in the main case and *pendente lite* on appeal. All concur.