ORA TEEL, APPELLANT, *v.* AMY TEEL, RESPONDENT.[*]

In the Springfield Court of Appeals. January 7, 1927.

---

[*]Corpus Juris-Cyc. References: Divorce, 19CJ, p. 73, n. 45; p. 133, n. 27; p. 143, n. 53; p. 192, n. 9; p. 193, n. 30.

*D. H. Kemp* and *D. S. Mayhew* for appellant.

*H. A. Gardner* and *J. E. Sater* for respondent.

106

BAILEY, J.—Plaintiff filed his petition for divorce from the bonds of matrimony contracted with defendant, returnable to the June term, 1926, of the Barry county circuit court; defendant, in due time, filed her answer and cross-bill. Plaintiff charged in his petition that defendant was hostile to his interests in business matters, refusing to sign papers; that she was quarrelsome, called him vile names in the presence of his children; accused him of being intimate with other women; refused to cohabit with plaintiff and spoke disrespectfully of his mother and relatives.

Defendant, in her cross-bill, after denying the allegations of plaintiff's petition, charged plaintiff with certain indignities, which may be briefly stated as follows: 1st: Possessed an ungovernable temper and constantly without justification was quarreling and nagging at her. 2nd: Falsely stating to her he was financially broke, and if she did not sign whatever papers he presented he would knock hell out of her. 3rd: Cursed and called her vile names. 4th: Plaintiff was addicted to the habitual use of intoxicants and frequently came home drunk and at one time brought their seventeen-year-old-son home with him drunk. 5th: Plaintiff brought into his house a man and wife and plaintiff and his company all became drunk, and plaintiff in the presence of defendant and family, kissed and caressed this drunken woman, and her husband in the presence of plaintiff attempted to kiss this defendant and caress her, and when she protested, she was called a damned fool, etc. 6th: Plaintiff admitted to her he was out with other women. 7th: Ordered defendant to leave and if she did not he would get his gun, and at one time snapped the gun at her. 8th: Plaintiff falsely accused her with being out with other men.

The trial court found defendant to be the injured and innocent party and entered judgment awarding her a divorce and the care and custody of two minor children, girls, while the oldest child, a boy, was awarded to plaintiff. The judgment further required plaintiff to pay $30 per month for the support of the minor children and also

awarded to defendant alimony in gross, in the sum of $5000 and the household goods. From this judgment plaintiff has appealed.

While divorce suits are held to be actions at law rather than suits in equity, nevertheless, it has been the uniform practice in this State to treat them as suits in chancery triable *de novo* on appeal. [O'Neil v. O'Neil, 264 S. W. 61, l. c. 64.]

It, therefore, becomes our duty, in passing on the question of whether or not defendant was entitled to a decree severing the marital relationship, to set forth the facts as shown by the record rather fully. Plaintiff and defendant were married in November, 1906, in Barry county, Missouri. From this union three children were born, consisting of a son and two daughters, whose ages at the time of the trial were about seventeen, twelve and six years, respectively. They continued to live together until April, 1925, or for a period of approximately nineteen years. Plaintiff was a good provider and defendant evidently a good mother and housewife and it was only during the last few years of their married life that serious trouble arose.

It seems they lived on their farm in Barry county until the year 1919 when they moved to a farm in Lawrence county, owned by plaintiff. Frequently while plaintiff would be away from home, his stock would break out. On this point defendant testified as follows: "Our main trouble was over the stock. For nine years I guess our stock has aggravated our neighbors and there was always someone phoning for us to come and get our stock, and I would raise cain about it and he was always in town and I had to take all the racket there was about it. I had to always go and try to get the stock in, sometimes I could and sometimes I couldn't. It was a continual warfare and every time I would say anything about the neighbors saying anything about the stock he would say that wasn't bothering him. He had a different stock at that time. At one time he had about thirty head of cattle and ten head of hogs and he didn't have the pasture for the stock and that was one reason they broke out. He wouldn't stay at home to look after them, that was all there was to it, and it would be me or Austin one that would have to go get the stock. They have been in the wheat time and time again. Sometimes there would be two neighbors call in one day about the cattle and hogs, and he would say I was a damn liar that they never called or never said a word about it, if they did they would have told him about it. It was almost every day during the summer this occurred, and I would talk and plead with him to fix the fence and he wouldn't, and we would have war every day and the neighbors were awful nice to put up with what they had to." Defendant was corroborated as to the stock breaking out and resulting quarrels by the testimony of her father E. D. Browning. This witness seemed

unusually fair to both sides, and we place considerable weight on his testimony. He stated that "I have been there a little over a year. I am not married. While I was out there at their home I never did see Ora mistreat my daughter, no more than just kinda short words. I have seen them both talk short. The best I can get at it, the trouble would come up over some stock a good deal, that seemed to be the bother about that. The stock would get out and it was a complaint to her and a worry about this stock, and of course they would get into a quarrel. She would commence and say that the stock had gotten out. She would tell him the stock was out and they would kinda get riled up about it. She would not begin it all the time. My daughter did not start the subjects all the time. I stayed down at Pierce City at Ora's place. I would be down there with him and I would go out with him at nights once in awhile, and when we would go out she would commence and tell him what had taken place sometimes. She would tell Ora the stock had gotten out and he would sometimes get a little short about it, and that is the way it would come up. It just occurred along and I paid little attention. I know that occurs in most families. I told them they could get along without it."

Two other witnesses testified to the fact that plaintiff's stock broke out. It may, therefore, be taken as an established fact that plaintiff's stock did break out and caused defendant considerable trouble and annoyance; that as a result plaintiff and defendant quarrelled and nagged each other about the matter to a degree, we think, unwarranted by the provocation. Defendant attaches great importance to these occurrences stating, in her testimony that, "our main trouble was over the stock." Her father, however, who lived with them, states that "it just occurred along and I paid little attention. I know that occurs in most families. I told them they could get along without it." While we defer largely to the findings of the trial court on controverted facts, we have no hesitancy in stating that in so far as the stock situation is concerned, it failed to arise to the proportions of an indignity as contemplated by our divorce law. We realize a thing of this sort may become aggravating to a wife who has to chase the stock and perchance endure a certain amount of complaint from the neighbors. But this record reveals no serious trouble with other people on account of the stock and in fact those who testified in regard to the matter had little to  say and seemed friendly to both plaintiff and defendant, pronouncing them good neighbors.

The most serious charge against plaintiff is in relation to the visits and conduct of one Bollinger and his wife. The defendant testified as to two occasions when they came to the home of plaintiff and defendant. She stated, as to the first occasion, that about eleven o'clock one night the Bollingers came. That, "we was all in bed and they honked out there and I got up and Ora (her husband)

got up and I said 'Let's not pay any attention to it,' and Ora said 'That is Bollinger' and he went and got his gun and when he said that was Bollinger and I told him to be careful and he said if Bollinger got him he would have to be quicker than he was, so they came on in but we didn't light no lamp or nothing, they knocked at the door so they stood out there at the door and Ora stood in the door and I stood back, and Bollinger said 'Pull that door too Ora' and Ora pulled the door too and I would pull it back and Mrs. Bollinger said 'Pull that door too I don't want that damn woman to see me,' and I let it go too then and she told him to kiss her and he said 'ah' and she says 'Now you kiss me, you used to kiss me all right now you kiss me,' and Bollinger was out on the porch and he says, 'Kiss her, I don't give a damn,' and he did.''

Defendant made other statements as to what occurred that night which are emphatically denied by plaintiff and we may say there is no testimony in corroboration of defendant as to such facts. She then testified as follows: ''They left, I don't know, it was about twelve o'clock I guess, and they came back. We just got back to bed and heard them come back again and they said they had run into somebody down the hill there.

''Q. What took place at that time? A. She cried and cried and Ora went out there and she grabbed him around the neck and kissed him a time or two and that seemed to cure her.

''Q. He went out to the car where she was? A. Yes sir.''

As to this particular visit of the Bollingers, E. D. Browning, defendant's father testified that, ''I was out at his place one time when Bollinger and his wife came out there. That wasn't the time that Dr. Snell was there. It was in last year as well as I remember, along towards spring. It was after dark awhile when they came. I had done gone to bed. I don't know whether all the family had gone to bed or not. Me and Austin had gone to bed and the car came up and honked and after while, as well as I remember, they came to the door, Mr. Bollinger did, and came in and his wife got up after a little while, and there seemed to be a little confusion. We went into the room there and they were talking and arguing. Bollinger could go all right but he just talked freely and seemed stimulated from something, I don't know what. I don't remember that Mrs. Bollinger came in. My daughter was in the house at that time, I wouldn't say whether she was in the room they were in or not. They got their talk over and left, and it wasn't but a short time until they was back again. They said they had a collision with a car. Mrs. Bollinger was moaning, we thought she was hurt. We went out to see what her condition was. I couldn't hardly say about it, I wasn't acquainted with them at that time. Me and Ora and Austin went out to the car, and I believe Mrs. Bollinger embraced the

boy. Mrs. Bollinger hugged Ora and he just kinda pulled back from her. She said they had run into something, as well as I remember, and she seemed to be scared or shook up or something that way, I don't think they were hurt much after they got over their scare or jar.''

On cross-examination he further testified that plaintiff was a reasonably sober man and that he didn't think plaintiff was drinking on the night the Bollingers paid their visit.

In reply to the question as to whether or not he was out at the car when Bollingers made their return visit he testified, ''Yes sir, I was right there, I was right by them. When she tried to hug Ora, he pulled back. He didn't hug or embrace her and he didn't kiss her and she didn't kiss him. I don't remember of any language there that was considered obscene or vulgar. I think my daughter was in the house. Ora and I have been out together a good many times fox hunting, and he always conducted himself as a gentleman in my presence and in the presence of my daughter, only when they would get into a little quarrel.

''Q. Isn't it your opinion that if your daughter would just get out of that temper of hers she and Ora could live together? A. I don't think so, I think they would both have to modify their ways.''

The other incident is referred to as the time when Dr. Snell was called to their home. Defendant testified that ''Ora came home about dark, that was on Sunday night, and it was a short time until Bollingers came. He came to the door and asked for Ora, and I told him I guessed he took the car to the barn because I seen him come in but he never came to the house, so I told him to go to the barn, and Ora was out there with the car and he said he was sick, he said he had been poisoned. He said the whiskey he drank had lye in it, and I asked him who gave him the whiskey and he said the Young boy gave it to him. When he said he was poisoned I said I would call the doctor and Bollinger didn't want me to call the doctor, and I went and called the doctor anyway. He came out and gave Ora some medicine. I asked the doctor to help me to try to get rid of them. He said he would try to get Ora to bed and maybe they would leave, and he got Ora to go to bed and when Ora got to bed they sat down on the bed and she hugged and kissed him while he was in the bed, so then the doctor said he had done about all he could and he went home, and the doctor went out of the house and Bollinger pulled a quart bottle out and they both drank and tried to get Ora to drink, but whether Ora drank or not I could not say, but I saw him offered a drink. After awhile Ora wanted to know if the doctor left any more of that medicine, I said 'Yes,' and he asked for it and I took it in there to him and he took it and handed the glass back and I started back to put the glass

up and Mrs. Bollinger said 'You get out of here, if you don't get out of here I will kick you out.' She was sitting on the bed, Ora was in bed. Ora did not say anything to that, and I was sitting in the rocking chair in front of the bed room door and Jeane was in my lap and Mr. Bollinger acted awful ugly, and I called Ora to make him behave himself.''

She further testified that Bollinger made indecent proposals to her and that her husband laughed.

Dr. Snell testified as follows:

''I was called on a visit to Teel's I think sometime in March. When I got out there there was a man and his wife out there, they told me his name was Bollinger. I judge this was about eight o'clock in the evening.

''Q. Tell the court whether Bollinger and his wife were intoxicated or sober? A. Well they were in a hilarious condition similar to people intoxicated. Ora was sick. He said he had taken a swallow of something, but he didn't know what it was and he immediately got sick. Ora's mind was clear. He wanted to go to bed and I left. Mrs. Teel was trying to get rid of the company. I do not know any more about Bollinger and his wife than that they were in a kind of hilarious condition as a person intoxicated, was about all. Ort Teel was there, he was sick at the time. He was vomiting. I might have been there thirty minutes. When I left Bollinger and his wife were there besides the family.

''Q. Had Ora protested or said a word to Bollinger and his wife about their hilarious conduct. A. He didn't say anything about anything—Bollinger and his wife appeared to be somewhat intoxicated. Ora was sick. I gave him some medicine. I gave him medicine to quiet the pain. I stayed half hour to see the results. While I was there I did not see anything out of the way, that is, in the way that was insulting, nothing more than the disagreeableness of these people in the house. I do not know how these people came there, whether before or after Ora got there, they were all there when I got there. I don't know when they came nor how long they had been there.''

Defendant offered as a witness her daughter Erma Teel. The trial court refused to permit her to testify. Defendant then made the following offer: ''She was present at the time that W. S. Bollinger and his wife were in their home intoxicated; that she saw Mrs. Bollinger kiss Ora Teel, the plaintiff in this case, and heard Bollinger offer to kiss her mother and the plaintiff had knowledge of such efforts on the part of Bollinger and made no protests or remonstrance, but, on the other hand, said to Bollinger that he did not care what he did.

"By the Court: The testimony is clearly competent and admissible under every rule of law that I know of. And the only reason the court is not admitting it is trying to save three children out of the wreck of this unfortunate difficulty and I don't want anything done in this court that would in any way alienate the affections of either father or mother of these children.

"By Mr. Kemp: To all of that the plaintiff agrees and concurs."

It would seem that at the time this witness was offered the court contemplated refusing a divorce to either party and, therefore, righteously desired to avoid the possibility of any future entrangement between parents and children. Since this evidence was not admitted it cannot be considered here in corroboration of defendant's statements. There was other testimony of defendant to the effect that plaintiff cursed and threatened her but no other witness so testified.

In regard to the Bollinger affair, plaintiff testified as follows: "I do not know anything about the circumstances detailed by my wife here concerning Bollinger, about a conversation of that character. I did not kiss that old lady, Mrs. Bollinger. I judge she is about sixty-seven years old, and this detail that she went into here never took place in my home. When they came and knocked at the door, my father-in-law was there as he stated, and I got up and went to the door. I did not make any statement as she has stated, and I did not know who was at the door. Some one drove up and knocked or hollered, I don't recollect which, anyway they came to the door and knocked, and I got up and raised the lid of the trunk and took the gun out and went to the door. I didn't know what it was. Bollinger is nothing more to me than any other citizen."

This record is rather remarkable in that both plaintiff and defendant, after testifying to all, perhaps, that they could think of against each other, nevertheless evinced a great affection for each other. Defendant was asked certain questions to which she replied as follows:

"Q. Have you any love or affection for your husband? A. Certainly I have, he always will look good to me.

"Q. How long have you considered it that way? A. I always have.

"Q. And notwithstanding all the objections you put in the cross-bill and the answer and things you have charged him with there, and you are willing to say to the court with all his faults you love him still? A. Yes sir."

Then defendant stated: "I told her before I left if she would go ahead and treat me like she ought to and like she used to, I would forgive everything and she would never know the difference but what I did.

"By the Court: And that means that you are willing to live with her? A. Yes, sir. If she would treat me right I would live with her, and sign those papers. That was the main reason, it wasn't about these hogs, there was nothing about that." It is also remarkable that notwithstanding defendant testified as to disgraceful conduct on the part of plaintiff with the Bollingers, she continued to occupy his bed and treated him in every way as though nothing out of the ordinary had occurred. Whether her conduct amounted to a condonation of the things with which she had charged plaintiff we do not feel called upon to decide. While we are inclined to place great weight on the findings and conclusions of the trial court who had the advantage of seeing and hearing the witnesses and observing their demeanor while on the witness stand, we are not bound to follow the trial court's conclusions. "Such cases as this address themselves to the conscience of the court, and, if we think the result arrived at by another tribunal does not comport with our conscience in the matter, it is our bounden duty to so declare." [Bassett v. Bassett, 280 S. W. 430 l. c. 438.]

It is our conclusion that the quarrels and other troubles resulting from the plaintiff's stock getting out were more or less trivial. Acts which may be construed as indignities and intolerable in the statutory sense must amount to a species of mental cruelty. [Holschbach v. Holschbach, 134 Mo. App. l. c. 257, 114 S. W. 1035; O'Hern v. O'Hern, 228 S. W. l. c. 536, 206 Mo. App. 651; Barth v. Barth, 168 Mo. App. l. c. 427, 151 S. W. 769.]

The Bollinger incidents are portrayed in rather a disgraceful light by defendant, but the testimony of both her father and the doctor, who was called to their home when plaintiff was sick, falls far short of corroborating her on what she says occurred. As heretofore indicated, we place great weight on the testimony of defendant's father who seemed to be remarkably impartial. He testified that plaintiff always conducted himself as a gentleman in his presence and the father certainly had every opportunity to observe plaintiff's conduct while living in his home. Practically every witness testified that both plaintiff and defendant bore good reputations for truth and morality. Plaintiff has been a good provider and defendant a good housewife. They have lived together for nearly nineteen years and have three minor children whose interests must ever be a guiding star to the courts in passing on questions of this character. It is well to save them, if possible, from the sad spectacle of their mother and father's divorce. Moreover, no one can read this record without arriving at the conclusion that this wife and this husband still have a deep-rooted affection for each other. Their differences, as we view the evidence are not of great moment and do not form an insurmountable obstacle to a reconciliation. As to

the most serious charges of defendant she stands uncorroborated. A divorce is rarely granted on the uncorroborated testimony of either party in a contested case. [Bassett v. Bassett, 280 S. W. 430.]

We are of the opinion neither party was entitled to a divorce. It is therefore, unnecessary to consider other questions presented. The judgment should be reversed and the cause be remanded with directions to dismiss plaintiff's petition and defendant's cross-bill, with costs taxed against plaintiff. It is so ordered.

*Cox, P. J.,* and *Bradley, J.,* concur.