LENA DOUGLASS, RESPONDENT, v. ALLEN M. DOUGLASS, APPELLANT.*

Springfield Court of Appeals.    May 20, 1930.

*Corpus Juris-Cyc References: Divorce, 19CJ, section 150, p. 73, n. 47, 48; section 272, p. 108, n. 20; section 367, p. 143, n. 53; section 479, p. 193, n. 32; section 561, p. 240, n. 23; section 614, p. 268, n. 90.

*Langdon R. Jones* for appellant.

*Ely & Ely* and *Orville Zimmerman* for respondent.

SMITH, J.—This is a proceeding for divorce instituted by the wife on November 21, 1928, before Hon. W. S. C. Walker, of the circuit court of Dunklin county, Missouri, who disqualified himself, and Hon. Chas. L. Ferguson was selected to try the case. After a trial of the issues involved in the case the court rendered its decree

granting a divorce to the plaintiff, with alimony to the plaintiff in the sum of $5000 and allowing an attorney's fee of $500 to plaintiff's attorneys. From such judgment and decree, defendant, after an unavailing motion for new trial has appealed to this court. The petition states that on the 10th day of February, 1916, in the county of Kanawah, in the State of West Virginia, the parties were united in marriage and that they removed to the State of Missouri in 1922 and continued to live in Dunklin county until the separation as alleged in the petition. The plaintiff alleged that she faithfully demeaned herself and discharged all her duties as the wife of the defendant and at all times treated him with kindness and affection. The material allegations in said petition are stated as follows:

"That defendant has been guilty of such indignities to the plaintiff as to amount to a species of mental cruelty and as to render her condition intolerable to this to-wit: That in August, 1928, at the suggestion and instance of the defendant she went to West Virginia to visit her mother. That she did not want to go and so informed the defendant.

"That while in Malden, West Virginia, and during the month of September, 1928, defendant wrote her that he did not want her to return home, that he had reached the place 'where I love myself more than I love you,' and wired her not to come home until he said for her to come, and to 'Stay there and do as I tell you.'

"That following receipt of letters and a wire from defendant telling her he did not love her and that the only solution of the matter was a divorce, she came home over his protest and was accompanied by her sister, Mona. That on arrival home he received her coldly and in the presence of neighbors she kissed him but he did not remove his pipe from his mouth and showed no affection but on the contrary indicated that he was very much displeased that she had returned home after an absence of several weeks.

"That as soon as she reached their dwelling the defendant in a very angry manner and in the presence and hearing of her sister said, 'What are you doing here?' and when she replied she came home 'to see him and to see what all this is about,' he replied in a very angry tone, 'You'll find out too, whose scheme is it that Mona is here?' and when she replied that she had been under a doctor's care and that Mona had come to be with her, he said, 'You can go back to West Virginia with her too. That's the place for you. I am not going to have you here. You and Mona can both go back to West Virginia.' That from that time on until she returned to West Virginia he was insulting and insisted she must not remain in Missouri and by his conduct made it impossible for her to live in their home. On divers occasions he insisted she should not remain

either in Kennett, or Senath, both places being where they had formerly lived and where she had and still has friends. He further forbade her talking with her friends or telling them anything about their troubles and told her to go quietly back to her mother in West Virginia. That he forbade her using the telephone or automobile without his consent and required her first to inform him what she was going to talk about before conversing with her friends. He told her he did not love her and never had and that he was through acting a hypocrite and to make it plain to her that he would not live with her, that she must leave.

"Plaintiff further states that she begged defendant when he informed her he would no longer live with her, to try again and on her knees entreated him to resume their married status as man and wife. To all her entreaties he remained immovable and adamant.

"That her absence now is an enforced absence, that she has no other place to live.

"Plaintiff states that she is a resident of the county of Dunklin and has resided in Dunklin county, and State of Missouri continuously for more than five years next before the filing of this petition."

The petition alleged the amount of property owned by defendant, and prayed for a complete divorce and for an allowance of alimony, with attorney's fees. The defendant filed an answer and cross-bill; the cross-bill, however, was dismissed before the close of the plaintiff's testimony, leaving the answer a general denial.

The defendant objected by *ore tenus* demurrer to the introduction of testimony, and complains here that the petition does not state facts sufficient to constitute a cause of action, and is insufficient to authorize a decree of divorce to plaintiff on grounds of indignities.

Our Supreme Court in a very early case of Hooper v. Hooper, 19 Mo. 355, 377, in discussing what constitutes indignities as grounds for divorce, used this language:

"It is impossible to lay down any rules that will apply to all cases, in determining what indignities are grounds of divorce, because they render the condition of the injured party intolerable. The habits and feelings of different persons differ so much, that treatment which would produce the deepest distress with one would make but a slight impression upon the feelings of another. It is impossible therefore, under the statute, to specify particular acts as the indignities for which divorces may, in all cases, be granted; for it is not possible to state the effect of such acts, in rendering the condition of all persons injured intolerable. The Legislature chose to leave the subject at large, and by the general words employed, evidently designed to leave each case to be determined according to its own peculiar circumstances."

This language was approved recently by our Supreme Court in an opinion by ATWOOD, J., in the case of Whitwell v. Whitwell, 300 S. W. 455. There can be laid down no certain or fixed rules applicable to every case in determining what indignities are sufficient grounds for divorce. But the subject must be left indefinite and each case must be determined in the light of its own peculiar circumstances. [Bedal v. Bedal, 2 S. W. (2d) 108; O'Hern v. O'Hern, 228 S. W. 533.] So considered in the light of the facts and circumstances shown by the record in this case, and the previous holding of our courts in such cases we must rule this point against the defendant.

The testimony in this case shows that the parties are both highly respected citizens, without a scintilla of evidence from either side attacking the honor and respectability of the other. It is one of those cases that an outsider, even though that outsider be a member of a court with the testimony before him, cannot understand, and without an attempt on our part to write a thesis on divorce, or the respect and the consideration that one spouse should have and show to the other, and without attempting to show just what limitations our Legislature intended to prescribe in naming the grounds for divorce, we think we are within the bounds of well-established precedents when we held that the petition is sufficient to state a cause of action based upon indignities, and that the testimony was sufficient to justify the trial court in granting a divorce to the plaintiff. We think it not necessary to set out the testimony at any great length; suffice it to say we have read it carefully and we think it sufficient to sustain the allegations of the petition. It is true that it does not show horrible and obnoxious conditions that are often shown in divorce proceedings, yet the testimony among other things does show a state of indifference on the part of the defendant towards the plaintiff extending over a period of two or three years, manifested in the defendant's lack of attention to plaintiff on trips when they were together, his failure or refusal to allow plaintiff to accompany him on trips when the other men were taking their wives, his refusal to be congenial and pleasant at parties and dances, his indifference and anger manifested at these meetings, his objection to her attending certain clubs and societies, his complaint at her expenditure of money for telephone calls and automobile trips, his leading her from his office in the presence of the young lady stenographer, his telling her that unless death or divorce takes her away that he is wasting his life because they had no children, yet the testimony shows that any efforts made to prevent children were acts of his and not of hers, his daily suggestions to her that she return to her mother's home, and after she did visit her mother's home his insistence by letters, telegrams, and telephone that she not return until he told her to come home, and when she did return, his indifferent attitude

towards her in the presence of her sister and her friends, all go to establish indignities as being that at least of mental cruelty. What are intolerable indignities depend largely upon the circumstances in each particular case, and while we know we have it in our power to determine this case regardless of what the chancellor did, and we are not trying to shift the responsibility, yet we feel that we should give great weight in this case to the findings of the chancellor, who saw and heard the parties with their witnesses and who was much better prepared than we are, to judge of the sincerity of the parties and the truthfulness of their statements, and particularly with reference to the defendant's offer of reconciliation. Therefore, in view of his findings, and in view of the evidence which we have carefully read we think the testimony amply sufficient to support the allegations of indignities alleged in the petition.

The defendant complains at the amount of the alimony allowed the plaintiff and the amount of attorney's fees allowed. The testimony shows that the defendant owns the title to 120 acres of land, reasonably worth $12,000; that he owns sixty-nine acres reasonably worth $5175; that he owns thirty-seven acres reasonably worth $2400; and that he has a life estate in seventy acres reasonably worth $100 per acre; that he has a home in Senath, referred to in the evidence as a darling house, worth $8000 or $9000; and that he has an insurance business in Senath from which he receives a net annual income of $1800. It is true the evidence shows that some of this property has been encumbered by him to build a house in Senath, and the property in which he has the life estate is encumbered along with other property belonging to the Douglass heirs, and that he owes some other debts, yet, the testimony shows that he has a splendid equity in the encumbered property, and that some of his property is not encumbered, and that he has a good business in Senath, and the evidence further shows that the plaintiff is now pursuing a business education in college to fit herself to make her own livelihood, after giving, as she says, thirteen of the best years of her life to the defendant. So we are forced to the conclusion that the amount of alimony allowing the plaintiff is not excessive.

We think the attorney's fees are not excessive. With a suit fought as this one was, with eminent counsel fighting eminent counsel, contesting every inch of the ground, both in the circuit court and in this court, and with the amount of property involved as here, we cannot say that an attorney's fee of $500 for services in both courts is excessive.

It follows that the judgment should be affirmed as to the divorce to the plaintiff, and as to the alimony and the attorney's fees. It is so ordered. *Cox, P. J.,* and *Bailey, J.,* concur.