GALLEMORE, Appellant, v. GALLEMORE, Respondent.

St. Louis Court of Appeals, November 28, 1905.

1. DIVORCE: Vagrant Husband. The provision of section 2921, Revised Statutes of 1899, allowing a divorce in favor of the wife when the husband shall be guilty of such conduct as to constitute him a vagrant within the meaning of the law, by the amendment of 1865 applied to any statute defining vagrancy which was then in force or might thereafter be enacted. Since the act concerning vagrants was repealed in 1897, the only act defining vagrants to which the divorce law can refer, is the criminal statute, section 2228, Revised Statutes of 1899.

2. ——: ——. A vagrant husband, as defined by section 2228, Revised Statutes of 1899, such as to create a ground for divorce, is an "able-bodied married man who shall neglect or refuse to provide for his family" and does not mean an able-bodied husband who is ready and willing to support his family but is unable to do so by reason of inability to obtain employment.

3. ——: ——: Inability to Find Employment. Where the husband was able-bodied, a physician of good habits endeavoring to establish a practice, maintained an office, contributed his entire income to the support of his wife and himself, although he was unable to earn enough to make a living and was largely dependent upon his wife for support, he was not a vagrant within the meaning of the law so as to authorize a decree of divorce against him on that ground.

Appeal from Franklin Circuit Court.—*Hon. William A. Davidson,* Judge.

REVERSED IN PART AND AFFIRMED IN PART.

*Jesse H. Schaper* for appellant.

(1) The cross-bill sets up but one ground of divorce, the ground of vagrancy of plaintiff, and the charge is pleaded in such general terms as to amount to no statement of a cause of action. Bowers v. Bowers, 19 Mo. 351; Dwyer v. Dwyer, 26 Mo. App. 647. (2) The

Legislature when it created by statute indignities as a ground of divorce, did not define what acts constituted such a ground. It left the subject at large. Courts have neither defined nor adopted any cast-iron rule as to what acts constitute indignities such as will support a decree · of divorce upon that ground. The most that can be said is that each case must be determined according to its own peculiar circumstances. Hooper v. Hooper, 19 Mo. 357; McCann v. McCann, 91 Mo. App. 1. This court has held that indignities contemplated by the divorce law as authorizing a decree of separation, consist of unmerited contemptuous conduct, any act towards another which manifests contempt for him, contumely, incivility or injury accompanied with insult and amounting to a species of cruelty to the mind. Goodman v. Goodman, 80 Mo. App. 281; Lynch v. Lynch, 87 Mo. App. 32.

*Marley, Swearengen & Utley* for respondent.

(1)   Section 2921, Revised Statutes 1899, which is a re-enactment of all of section 4500, Revised Statutes 1889, carries with it the same construction as given by our courts. It gives as a ground for divorce, "When the husband shall be guilty of such conduct as to constitute him a vagrant within the meaning of the law respecting vagrants." This is the ground assigned by defendant in her cross-bill. Defendant being entitled to a divorce under cross-bill, the evidence showing that plaintiff then and there being an able-bodied married man, neglected to provide for the support of his family, she is also entitled to, and the trial court was justified in restoring to her, the property taken from her by her husband, or given by her to the husband during their married relations. Viser v. Bertrand, 16 Ark. 296; Hailey v. Hailey, 14 Pac. 92; O'Halloran v. O'Halloran, 49 Ga. 301; Tewksbury v. Tewksbury, 5 Miss. 109; Chunn v. Chunn, 19 Tenn. 131; Sharp v. Sharp, 34 Tenn. 496; McGill v. McGill, 19 Fla. 341; Vandeuser v. Vandeuser, 6 Paige 366; Holmes v. Holmes, 4 Barber 295;

(2)  Chapter 169, Revised Statutes 1889, was declared unconstitutional in Ex parte Thompson, 117 Mo. 83, and from that time to the revision of 1899, was inoperative; co-existent with that law was section 3841, Revised Statutes 1889, now section 2228 of revision of 1899.  In case of Dwyer v. Dwyer, 26 Mo. App. 651, section 2218 was construed and that opinion has written into it what is now section 2921, Revised Statutes 1899.  After much construction the same ground for divorce was re-enacted in section 2228, revision of 1899, while chapter 169 was abandoned and dropped from the revision after being held invalid in Ex parte Thompson, referred to above. The re-enactment of section 841, Revised Statutes 1889, as section 2228, and the re-enactment of section 4500, Revised Statutes 1889, as section 2921, in revision of 1899, amounts to an enactment of section 2921 with the interpretation given by Dwyer v. Dwyer, written therein.
(3)  In Northcut v. Eager, 132 Mo. 265, our contention is sustained.  Again, if such was not the construction to be given the section, we should have a ground for divorce set out in the section without anything to operate upon, thereby making it to that extent an absurdity and such a construction would not be favored by this court.  City of St. Joseph v. Landis, 54 Mo. App. 322; Birmingham v. Birmingham, 103 Mo. 345; Railroad v. Brick Co., 85 Mo. 329; Ex parte Marmaduke, 91 Mo. 254; State v. Hayes, 81 Mo. 185.

STATEMENT.—The husband is plaintiff.  His petition prays a divorce from the defendant wife, alleging indignities and other statutory grounds.  The answer admitted the marriage to have taken place June 30, 1903, and other uncontroverted facts; contained a special denial of each and every allegation of fact in the petition which would authorize a divorce, also a general denial, and affirmatively alleged that she paid for the support of both by her separate means, at a cost exceeding $4,000; that at the time of her marriage, she was possessed in

her own right of $7,000, practically all of which had been expended in and about their support, with the exception of $1,250 which had been loaned by plaintiff to his brother, taking a note therefor payable to himself, due in January, 1905, and which he now holds; also $350 which plaintiff expended to buy office furniture and surgical instruments and supplies, and $110 used by plaintiff to purchase for himself a diamond shirtstud, and prayed the court for an order on plaintiff to deliver all of said property and note for $1,250 mentioned, to defendant. It also contained a cross-bill, praying a divorce from plaintiff on the ground that "he has totally failed and refused to support the defendant without just excuse, although he was amply able to do so, so as to constitute him a vagrant within the meaning of the law respecting vagrants." The record also shows that in aid of the answer and cross-bill, the defendant filed her petition before two of the judges of the county court in chambers, the circuit court not being in session, and presumably no judge thereof being then in the county (sec. 3628, Revised Statutes 1899), praying that the plaintiff be restrained from disposing of the $1,250 note and said office furniture, surgical instruments, shirtstud, etc., so purchased by plaintiff with defendant's means, and then in his possession. Upon defendant having furnished proper bond, an injunction was granted as prayed and in the circuit court a supplemental or intervening petition was filed by defendant, bringing this matter to the attention of the court and setting up the same facts. A motion to dissolve the injunction was filed in the circuit court, and the hearing of the petition and cross-bill for divorce, also the injunction and motion to dissolve the same, were all had at the same time.

The facts developed on said hearing are briefly as follows: The parties were young people; had formerly lived at Walnut Grove, Missouri, where plaintiff, a young physician, owned a drug store valued at about $1,000. The young lady was possessed of bank stock in

her brother's bank at that place of about $2,500, and $4,500 in solvent and secured notes. They were married at Springfield, Missouri, June 30, 1903, and started on a trip with the purpose in part of seeking a location for the doctor. They visited Mammoth Springs, Arkansas, and remained a few days; also Black Rock and Little Rock in said State, thence to Charleston, Missouri, thence to Piedmont, thence to Morley, remaining a few days at each place and investigating the advantages of each place as a location for a physician. From Morley they journeyed to Poplar Bluff, where they located, and rented a cottage, for which they paid $18.50 per month, purchased household goods and established a home. The doctor rented an office at $15 per month and fitted it up. Here they remained for about three months and the doctor met with the same experience which is usual with all of us who have endeavored to start in a profession without means or experience. Employment was infrequent and remuneration slow. He did not succeed. After three months of this, they decided to and did move to Campbell, Dunklin county, where the doctor opened a drug store. He removed a portion of his stock at Walnut Grove which had been standing locked up a portion of the time. It does not appear what became of the portion of the stock not removed, but it is inferable that it was sold, inasmuch as it is in testimony that he realized about $800 out of it. The drug store venture at Campbell brought only trials and tribulations, for here the doctor was indicted on twelve different charges for selling liquor in violation of the local-option law, and pleaded guilty to two indictments. He was fined on the first, $500 and on the second, $1,000, and sentenced to serve one year in the county jail. On this judgment he was incarcerated in the jail about one week when his wife came to his rescue by making a personal appeal in his behalf and an arrangement was made whereby, upon payment by her of $750 of the fines and costs accrued, a portion thereof was remitted and the jail sentence stay-

ed upon condition that the doctor should remove within one week from the county. Mrs. Gallemore, the wife, then paid $750, the doctor sold the drug store for $250 and the parties removed to Washington, Missouri, November, 1903, where they resided at the time of the institution of this suit. Here they rented some rooms, occupying a part as their residence and a part as the doctor's office and he commenced to practice his profession. Three hundred and fifty dollars of the wife's means was invested in office furniture and surgical instruments and he deposited $1,600 of the wife's money in his name in the bank at Washington in order to give him a creditable standing. Twelve hundred and fifty dollars was afterwards loaned out at interest by him to his brother with his wife's consent on a note and the note made payable to him for reasons of credit to him, as indicated. The evidence shows that the doctor remained around the office waiting for patients, reading medical books and literature, doing but little practice. The neighbors testified that he seemed to be kind and good to his wife as well in public as at home, and that she was equally kind and good to him. No word derogatory to the good character of either is in the record, save regarding the liquor-selling trouble in which the husband was involved at Campbell. The doctor complains that his wife did not like Washington, saying the people were all Dutch, and that she would laugh at some of his patients and thus annoy him; and that she objected to his treating lady patients between the ages of twenty and forty years and would open the door from the living rooms into his office when his patients were there; that she would not make coffee for him and neglected other household duties; all of which she strenuously denied and we think the evidence is indeed slight against her. Through it all, we think there runs a vein showing her to be a good but high-spirited woman, much annoyed by their inability to succeed financially. There are other matters of complaint on the husband's part which are denied by

the wife, and under the finding of the court in that behalf, seem to have had but little influence in the case. In view of her denial and such finding, they will not be further noticed. The wife testified that the husband was really good and kind to her about the house and assisted somewhat with the housework and that there was really no trouble between them except that he desired to build houses with the remaining portion of her money and she would not agree to it; that he became miffed and requested her to leave and she did so; and in fact, there seems to be very little evidence, if any, in the record to support a judgment of divorce. The record savors of childish disagreements. The principal complaint of the wife is that the doctor did not make their support and that her means were used and not his, to defray the expenses; while on the other hand no intimation is made that he was dissipated or that he was a man of bad or unseemly habits, and it is palpable that she was a splendid good woman. The evidence all tends to show that he did not seek manual or other employment; being a young physician, he remained idle at his office for the very good reason that few sought his professional services. In other words, he did not seek employment in the pipe factory at Washington, in order to make their support, as she suggested in her testimony he might have done. The record clearly shows that he attended to such professional calls as came to him and that, while his profession, like that of young doctors and lawyers generally, in a strange community, was not remunerative and did not render him a living, his practice was improving and the last month before the separation, he collected from it $70. It clearly appears from the testimony of both the husband and wife, that what he had, which was but little indeed, and all that he made, was expended in support of himself and wife; yet she contributed much more than he to the support, and it is true their traveling around from place to place consumed her means rapidly, inasmuch as he was then earning nothing to assist in

defraying the expenses. She repeatedly and frankly says, however, that there was no complaint on her part at that time on this score, and that her means were contributed cheerfully to the end for which they were used. There is no doubt from this record that she is a splendid good woman and he a very good man; he, unfortunately poor, and she reared in plenty. They each loved the other and had they remained in one place long enough for him to have become established and succeeded, no doubt this cause would never have been before the court. It certainly ought not to be.

At the conclusion of all of the evidence, the court dismissed the bill and entered its decree on the cross-bill, granting the defendant a divorce from the bonds of matrimony, on the ground that plaintiff is a vagrant within the meaning of the law as to vagrants, and also ordered plaintiff to deliver to the defendant the note and personal property mentioned in the bill, which was alleged to have been purchased with her separate means. Plaintiff appeals, contending that the court erred in finding him to be a vagrant.

NORTONI, J. (after stating the facts).—Our present statute authorizing divorce and enumerating the causes therefor, among other things, provides that the wife may be divorced "when the husband shall be guilty of such conduct as to constitute him a vagrant within the meaning of the law respecting vagrants. [Sec. 2921, R. S. 1899.] The present phraseology of the statute as above quoted, first appeared in the revision of 1865, chapter 14, section 1, page 460. The idea, however, rendering the vagrancy of the husband a cause for divorce in this State did not originate in the statutes of 1865. It first appeared in the divorce laws of Missouri of 1845, section 1, of "An act concerning Divorce and Alimony." [R. S. 1845, p. 424.] The language of the statute there to be found on the subject is: "Or when the husband shall be guilty of such conduct as to constitute him a

vagrant within the meaning of the first section of an act respecting vagrants." The original act respecting vagrants therein referred to was approved March 19, 1835, and is to be found in the Revised Statutes of 1837, page 613; also, substantially, in Revised Statutes 1845, page 1070; Revised Statutes 1865, section 1, chapter 77, page 380; Revised Statutes 1879, section 7655, and Revised Statutes 1889, section 8846. The first section of that act to which the divorce laws of 1845 refer as furnishing a definition of vagrancy and the conduct authorizing a divorce in the contemplation of the divorce section on the ground of vagrancy, is as follows:

"Every able-bodied person who shall be found loitering or rambling about, not having wherewithal to maintain himself by some visible property, and who doth not betake himself to labor or some honest calling to procure a livelihood; and able-bodied persons who are found begging, and who quit their houses, and leave their wives and children without the means of subsistence, shall be deemed and treated as vagrants." [R. S. 1845, sec. 1, chap. 181, p. 1070.]

It is apparent then, that the vagrancy in the mind of the Legislature, when such was first made a cause for divorce in this State, was that defined in the section above quoted and none other, for the divorce law specifically referred to this, the first section of the act concerning vagrants, and as said before, this section remained in the law of this State, substantially the same, running through all of the various revisions up to 1889, where it appeared as section 8846. In 1893, however, the Supreme Court, in the case of In re Thomas, 117 Mo. 83, 22 S.W.863,declared a succeeding section of that act, the section providing for the advertisement and hiring out of such vagrants, unconstitutional, and in 1897 the Legislature saw fit to and did repeal so much of the act on the subject, then chapter 169 of the Statutes of 1889, as remained. [See Laws 1897, p. 239.] And thus, this enactment to which our divorce law on the subject orig-

inally referred for further enlightenment, passed from our code and no longer exists. In 1865, however, as hereinbefore stated, the phraseology of the divorce statute was changed so as to read: "Or when the husband shall be guilty of such conduct as shall constitute him a vagrant within the meaning of the law respecting vagrants." [R. S. 1865, chap. 114, sec. 1, p. 460.] The divorce law has remained in this language ever since the amendment of 1865, and this is its present phraseology, as first above stated. Thus we see from the amendment of 1865 that the particular reference to section 1 of the vagrancy act was omitted, and the language employed manifested the intention of the Legislature to authorize a divorce on the ground of vagrancy when the conduct of the husband was such as to bring him within the meaning of any law of the State then prevalent on that subject. At the time the change was made in the phraseology of the divorce law, however, there was no other law on the subject of vagrancy in this State than that substantially above quoted. In 1879, the Legislature furnished us an additional section upon that subject (sec. 1528, R. S. 1879; sec. 3841, R. S. 1889; sec. 2228, R. S. 1899), which section occupies a place in the criminal code of that revision, and it is provided by it that a person falling withing its provisions shall be deemed a vagrant, and upon conviction thereof, shall be punished by imprisonment in the county jail, or by fine, etc. This section has remained in our law ever since and is section 2228, Revised Statutes 1899, and parcel of our present criminal code. It therefore appears that from 1879 until 1897, when the original act of vagrancy (that of 1835) was repealed, there were two statutes defining vagrants, and that our divorce law referred to either or both.

From this historical review of the subject, it is obvious that when the idea of the vagrancy of the husband was first incorporated into the divorce law, it had reference only to the vagrancy defined in the first section

of the act above quoted. But in 1865, the divorce statute having been so modified as to admit of any definition of vagrancy which the Legislature might then or thereafter provide, and in 1879, the Legislature having provided an additional section, that is, the criminal section of the present statute, section 2228, supra, on the subject, while both of these vagrancy statutes were parcel of our law, this court held, in Dwyer v. Dwyer, 26 Mo. App. 647, Judges THOMPSON and LEWIS concurring, that the language of the divorce statute, "within the meaning of the law respecting vagrants," had reference to any or all of the then provisions of the Revised Statutes respecting vagrants, not only to the provisions of the Act of 1845, supra, but it referred as well to the section, supra, enacted in 1879, found in our present criminal code. In that case, there seemed to be much diversity of opinion between the members of this court on the various questions there in decision, and three separate opinions were delivered, one by each member; but we find in the opinion of the court by Judge THOMPSON (l. c. 652) that Judge ROMBAUER concurred to the extent and it was the opinion of the court, "that the criminal statute is leveled against vagabond husbands, who, having the ability to do so, neglect and refuse to support their families generally." From investigation, we therefore find the present state of the law to be that there is but one statute in the books defining vagrancy and that this statute, the criminal section, has been held to apply only, in a case of this nature, to vagabond husbands having the ability to do so, yet neglect or refuse to support their families.

The criminal statute referred to, so far as it is pertinent to this case, reads: "Every person, . . . and every able-bodied married man, who shall neglect or refuse to provide for the support of his family . . . shall be deemed a vagrant." [Sec. 2228, R. S. 1899.] It seems clear to us that the above quoted provisions of this statute, when read in the light of common knowl-

edge and experience, are leveled, as held in the case above cited, against the able-bodied married man, who, having the ability to do so, either neglects or refuses to furnish the support mentioned. That is the vagabond husband. For it cannot be that the Legislature intended to denounce as criminal the failure of one to support his family who was prevented from doing so for no other reason than his inability to obtain employment, no more than it intended to denounce as criminal such failure on the part of one whose inability to support his family arises from his misfortune in not being able-bodied. Indeed, the result is the same in either case. If he be not able-bodied, he is excused by the wording of the statute itself, on the theory, of course, that he cannot be required to perform, under penalty, that which nature, or misfortune, has rendered him incapable of performing. The same charitable notion which is manifest in the plain statutory exception, must be given life and vigor in construing the remaining provisions of the section. The manifest intention of the law-makers must be sought out and followed. From the very wording of the act, it is obvious that the Legislature intended to except the invalid or decrepit husband from the penalties thereof, upon the hypothesis that it would be both unreasonable and unjust to inflict punishment upon him for not doing that which, by reason of his misfortune, he could not do. With this thought in mind, we are persuaded that the legislative intent clearly evinced was to except from the penalty also the able-bodied husband who was ready and willing to support his family, yet was unable to do so by reason of his unfortunate inability to obtain employment and thus render to himself and to his family a livelihood. To place any other construction on the statute would be tantamount to holding that the Legislature had enacted that every able-bodied husband, who was unable to support his family, would be a criminal and render him a vagrant and a disgrace; whereas it is neither criminal nor disgraceful to be poor. Under such

a construction, every man, however anxious and willing to labor and provide for his family, would be liable to be declared a vagrant at the suit of his wife for divorce, for no other reason than that he was able-bodied and failed to support his family. Indeed, such a construction in times of commercial depression and paralyzed industry, might prove ruinous to the peace and repose of society. Men theretofore honest, seeking employment, would be in many instances, driven to pillage and plunder to render the support required, rather than render themselves liable to prosecution and subject to divorce proceedings upon their failure to provide such support. No such unjust and unreasonable construction of the statute should be had or even contemplated for a moment. It therefore must necessarily follow that the Legislature intended, when it provided that an able-bodied man should be deemed a vagrant when he either neglects or refuses to support his family, that it was leveling the penalty of the law only at the vagabond husband who had the means or ability to render such support and neglected or refused, and that it was not intended to level such penalty at the husband who was willing to do so and whose neglect or failure in that respect arose solely from his inability to find employment. It seems quite clear that such a case was not contemplated as being within the spirit of the act. Indeed, the employment of the words "neglect" or "refuse" by the Legislature is demonstrative of the intent. "Neglect" arises from an inattentive state of mind, want of care for and an utter disregard of, in this connection, the obligation resting upon the husband to support his family; whereas, the word "refuse" imports a willful disavowal of or disregard for such obligation. It is therefore obvious that the husband who is denounced as a vagrant, is one who neglects or refuses the support from his want of proper regard for the social duties and obligations of life, his total or partial disregard of the ties of filial affection, and his insensibility to and want of respect for the fam-

ily relation upon which the whole superstructure of civilized society rests. When for this cause, he refuses to render that support which every consideration of good conscience and correct conduct requires of him, he is indeed a vagabond husband, and should be declared a vagrant. Not so, however, in a case where the evidence shows that the husband, although able-bodied, is a professional man, seeking employment as such, giving to his profession his undivided attention and rendering his entire remuneration in that behalf to the support enjoined, for in such case, he is demonstrating his willingness to perform, and his respect and esteem for the obligation enjoined, and is performing to the very best of his ability to the end required. When it appears, as in this case, that the husband was a physician, a man of good habits, endeavoring to establish a practice, maintained an office, remained there awaiting patients, and attended to such calls as he had, contributed the entire income from his practice to the support of his wife and himself, this certainly will preclude him from being placed by the law in the category of the vagabond husband who willfuly and with a disregard of social obligations, neglects or refuses to maintain his family. Indeed, the law will not be so harsh and severe as to require a professional man to abandon his profession for no other reason than that business comes slowly, and betake himself to some other calling, under penalty of being declared a vagrant for failing to make a living, when he is doing the best that he can, and all that he can, in that behalf. It is indeed deplorable that his remuneration was insufficient to support his family, and that his wife was called upon to contribute the greater portion to the support of both, but non-support of the wife is not necessarily vagrancy on the husband's part. There must be present in addition thereto, the essential elements of the vagabond husband. Nor is non-support, of itself, a cause for divorce in this State. [Freeman v. Freeman, 94 Mo. App. 504, 68 S. W. 389.]

After careful consideration, we wholly fail to discover any evidence in the record before us supporting the finding that the appellant is a vagrant; therefore, the judgment so declaring him to be, and divorcing the wife upon that ground, is reversed. The judgment dismissing his bill for divorce and in all other matters will be affirmed; the costs to be taxed against appellant. *Bland, P. J.,* and *Goode, J.,* concur.