HELEN ROSE ENGLAND, RESPONDENT, v. CLARENCE W. ENGLAND, APPELLANT.—39 S. W. (2d) 429.

Kansas City Court of Appeals. Opinion filed May 25, 1931.

726

*E. McD. Colvin* and *Grover Joyce* for respondent.

*Casey & Wright* for appellant.

ARNOLD, J.—An appeal from a decree of divorce. The parties were married on February 1, 1921, and lived together as husband and wife until April 7, 1930, at which time plaintiff left defendant, taking with her their three children, and on April 19, 1930, this suit was filed on the ground defendant had offered such indignities to plaintiff as to render her condition intolerable.

The petition is formal, alleging the necessary jurisdictional matters, and then charges:

"That during all the time they lived together plaintiff faithfully demeaned herself and performed all her duties as the wife of defendant, always treating him with kindness and affection; but defendant wholly disregarding his duties as the husband of plaintiff has offered her such indignities as to render her condition intolerable in this:

"He has failed to provide for her support and the support of their children; he has compelled this plaintiff to perform such manual labor around the home as has undermined her health; he has done nothing to assist in the care of the children and she and they have always been supported by plaintiff's father."

The petition states three children were born of their marriage, to-wit, Georgia, one and a half years old, Geraldine, six, and Mercedes, eight years old. The prayer is for divorce, custody of the children

"and for such orders touching the support of herself and children as to the court may seem proper."

The answer admits the marriage and separation, as alleged in the petition, and denies generally all other allegations therein contained. The cause was contested, both parties introducing evidence. The court found "the allegations in plaintiff's petition are true, and that plaintiff is the injured and innocent party and entitled to the relief prayed;" and decreed the dissolution of the bonds of matrimony theretofore contracted between plaintiff and defendant, and that plaintiff be forever freed therefrom; that plaintiff have the custody and control of the minor children born of said marriage, from June 1, 1931, and each year thereafter between September 1 and June 1, of each year; and that defendant have the custody, control and care of said children from June 1 to September 1, during each year; that plaintiff shall bear all the expense of maintenance and education during the time allotted to her for said children; and that defendant shall pay all the expenses incurred in going after said children and returning them to plaintiff, and that defendant shall bear all expenses during the time he shall have the control and care of said children. Plaintiff was also given judgment for costs. Motions for a new trial and in arrest of judgment were duly filed and by the court overruled.

Three assignments of error are presented for our consideration, as follows: (a) The evidence has not sufficient probative force to etablish the allegations of the petition; (b) the evidence fails to establish facts that constitute indignities, as that term is construed by the courts of this State; (c) the decree of divorce was granted upon the respondent's uncorroborated testimony. It is urged the evidence is insufficient to establish the allegations of the petition and does not establish facts that constitute indignities, as contemplated by the statute. In considering this point, it is proper to note the petition alleges indignities generally, and that these allegations are followed by allegations of specific acts, as shown by the quotation from the petition above set out. The facts shown by the evidence are as follows:

At the time of her marriage and prior thereto, plaintiff resided with her family in Kansas City, Mo. Defendant is the son of a dairy farmer and has been engaged in dairy farming all his life. The two families had known each other from the time plaintiff was fourteen years of age. After their marriage, plaintiff and defendant moved to a farm near the town of Richards in Vernon County, Missouri, where defendant was engaged in dairy farming for about four year. They then moved to Overland Park, Johnson County, Kansas, where defendant continued his dairy business for two years. He then purchased a farm near Hickman Mills, Missouri, in Jackson County, for which he agreed to pay $10,000, giving a mortgage there-

for, and on which he had paid $2,000 prior to the time this suit was tried. There he continued his dairy farming to the time of the trial, with the exception of a few months during which his farm was leased to another, under an agreement whereby the lessee was to produce milk which defendant was to purchase and sell at retail on a milk route he was developing.

The testimony shows that plaintiff, during this time, performed her duties as housekeeper, doing all the work herself excepting, after her last child was born, the laundry work was done by a laundry, and for this work defendant paid; and for a short period after the birth of the last child, a maid was employed for the housekeeping. The record shows there were no serious disagreements or bickerings between the parties, no quarrels, no fights or other disturbances. The only ripples on their matrimonial waters were plaintiff's complaints of defendant's methods of handling his business.

On April 7, 1930, plaintiff left the home, taking with her the three children, ostensibly for the purpose of taking a vacation trip. Upon defendant's return home that night, he found the following letter, written by plaintiff:

"Clarence:

"I have an opportunity to take a long needed rest with all my expenses paid which I have already told you.

"Clarence, I cannot stand this awful drudgery & worry any longer or I think I will *loose* my mind if I have to bring up my children in such environment any longer.

"So I don't suppose this will be much surprise to you as I have tried in vain to talk these things over with you.

"So good bye,
HELEN."

Defendant testified the receipt of this letter was the first information he had of plaintiff's intention to separate from him. However, plaintiff testified she had previously tried in vain to tell him.

Defendant did all the work necessary to handle his dairy farm and business, except he usually had one man or boy employed to assist from the date of the marriage to the time of the separation, and that he did not lose a single day's work. The testimony shows his dairy herd consisted of from seventeen to thirty-four cows, and he had but one diversion, that of wolf and fox hunting with dogs. It is gathered from the evidence that defendant's business did not prosper. Defendant's testimony shows he used all his income to pay necessary expenses of maintaining his family and at the same time operate his dairy; that his gross income was about $200 per month.

Plaintiff, in her testimony, admits defendant was not dissipated and did not squander his funds, but states he was lacking in business ability and was not a hustler. It is agreed defendant furnished

all the food, clothing and other necessaries for his family to the extent of his financial ability, excepting some cash gifts to plaintiff from her father, in sums of about $100 each year at Christmas—with the exception of one year when the gift was only twenty-five dollars, or entirely omitted. Plaintiff says she used these gifts in purchasing clothing for the children and at one time paid a grocery bill of nearly one hundred dollars to a grocer at Hickman Mills. However, defendant in his testimony denies this and states he paid that bill in cash from his own funds. Plaintiff testified there were gifts from her father other than those at Christmas, which, in her opinion, would amount to the total sum of two thousand dollars, during the years of their married life. Specifically, she testified to only two such gifts, amounting to one hundred fifty dollars. At the trial plaintiff stepped somewhat outside the allegations of her petition and stated, as a reason for leaving defendant and as indignities in support of her petition for divorce, that she had discovered her husband was dishonest. She detailed instances tending to show a lack of integrity on the part of defendant, stating defendant had a boy employed at the dairy take a can of gasoline from a tank located on the farm of a neighbor, in the nighttime, without that neighbor's knowledge and consent; of his having a boy employed by him, at another time, take corn from a neighbor's field; and of defendant having picked up a wrench, a pair of scissors and a pair of pliers while on his milk route and carrying them home,—in other words, purloining them; that he had made misrepresentations to secure settlement of a claim growing out of an injury to one of defendant's cows, stating the cow was killed, when in truth and in fact, she had only broken a leg.

These matters touching defendant's integrity were not alleged in the petition but the testimony was not objected to, and the cause was tried as though they had been pleaded. The evidence must therefore be considered by us as though pleaded. [Harwood v. Toms, 130 Mo. 225, 240, 32 S. W. 666; Long v. Coal Co., 233 Mo. 713, 136 S. W. 673; Allen v. Lumber Co., 171 Mo. App. 492, 157 S. W. 661; Palmer v. Transfer Co. (Mo.), 209 S. W. 882; Marshall v. Brown (Mo. App.), 230 S. W. 347, 348.]

We turn now to the first assignment of error to the effect the evidence is not of sufficient probative force to establish the allegations of the petition, and to the argument, under points and authorities, that the evidence does not establish facts constituting indignities, as contemplated by the statute. The part of section 1350, Revised Statutes 1929, referring to indignities as grounds for divorce, is as follows: "or shall be guilty of such cruel or barbarous treatment as to endanger the life of the other; or shall offer such indignities to the other as shall render his or her condition intolerable."

For an indignity to be intolerable in the statutory sense it must amount to a species of mental cruelty. [Holschbach v. Holschbach, 134 Mo. App. 247, 114 S. W. 1035.] There must be more than one indignity. [Mahn v. Mahn, 70 Mo. App. 337.] The statute fails to define indignities and the question must be determined by the facts in each individual case. [O'Hern v. O'Hern, 206 Mo. App. 651, 228 S. W. 533; Kempf v. Kempf, 34 Mo. 211; McCann v. McCann, 91 Mo. App. 1.] The first indignity specifically alleged in the petition is that defendant has failed to provide for the support of plaintiff and her children. This charge may be considered that of non-support. It has been held non-support, of itself, is no ground for divorce. [Gallemore v. Gallemore, 115 Mo. App. 179, 192, 91 S. W. 406.] Nor may non-support amount to an indignity unless it may be construed as a refusal of support in such manner as to amount to a species of mental cruelty, rendering plaintiff's condition intolerable. Here, there is no charge and no proof of refusal of support. The charge now under consideration is that "he failed to provide for her support and the support of their children."

. An action for divorce partakes of the nature of a suit in equity. In all such cases it is the duty of an appellate court to review the evidence and determine the case de novo, forming its own conclusions as to the evidence and having in mind the rule that due deference must be given the findings of the trial court where the evidence is conflicting. [Bassett v. Bassett, 280 S. W. 430, 437; Scholl v. Scholl, 194 Mo. App. 559, 565, 185 S. W. 762; Esworthy v. Esworthy, 11 S. W. (2d) 1078.] It is for us, therefore, to determine whether defendant's failure to meet the situation constitutes actionable indignity. The testimony shows defendant is poor; but poverty, in itself, is not a sin, nor may it be held to amount to an indignity. [Campbell v. Campbell, 73 Mo. App. 579, 584.] As already stated, plaintiff testified her father furnished clothing for the family and in addition to the Christmas presents above referred to, she stated she had secured money from her father "hundreds of times." On cross-examination plaintiff testified:

"Q. In other words your children always have been supported by your father? A. We have practically always. He has bought the bulk of the clothes. There was very few things that we ever bought outside of shoes for the children and the house dress for me and besides that I have paid grocery bills and my father has given us hundreds of dollars and practically every cent of it, nearly every cent of it has gone for paying bills."

Plaintiff further testified:

"Q. Other than the Christmas checks of one hundred dollars, or whatever they were, your father has given you a hundred dollar check about February—no, fifty dollars, in February, and a hundred dol-

lars in 1928? Has he given you any other checks than those? A. Why, yes; he has given me other checks, but I cannot recall them. As far as that is concerned, since I have been married, I expect he has given me around two thousand dollars. Around there.

"Q. In your petition you state first that your husband did not support you? A. Well, he did not entirely. I did not say that he did not support me at all. I said that he did not—he gave me enough to eat and that was just about all. We did not always' have that much."

On further cross-examination plaintiff testified:

"Q. Isn't it a fact that your husband has paid all of the grocery bills, with the exception of a hundred dollars or such a matter, during the entire time that you have been married? A. Practically.

"Q. Yes, and when it came to the question of getting clothing for the children, isn't it a fact that you would go to him and say this or that child needed shoes and he would say how much money do you have to have, and he would hand it to you? A. Sometimes it was that way, but there was very few times that I ever asked him for anything outside of shoes for the children."

Defendant's testimony on this point was as follows:

"Q. I will ask you what you have done in the way of supporting your family from the time you were married down to the present time? A. I've done everything to give them a good home and provide for them that I could afford to.

"Q. You set a good table? A. Yes, sir.

"Q. And your wife was a good cook? A. You bet she was, no better.

"Q. Now, you paid your grocery bills? A. I did.

"Q. You heard the testimony here about some grocery bill that was back and a hundred dollars was used to pay it. Do you know anything about that? A. No, I do not.

"Q. Now, during the time that you were married have you purchased and paid for the groceries and supplies for your family? A. Absolutely. Nobody else did.

"Q. Did you ever ask Mr. Ross—? A. I never asked him for a dime in my life, and he has never given me any.

"Q. What, if any, gifts of money do you know of? A. Well, Mr. Ross has given her several hundred dollars for Christmas presents, outside of that to my knowledge he gave her nothing.

"Q. Has he given her a hundred dollars each year as a Christmas present? A. I think he did up until last year. I think he missed last year.

"Q. Has he ever, so far as you know, given her any money excepting those Christmas presents? A. No.

"Q. And as far as your wife's clothes are concerned, how did you arrange about her buying her clothes? Where did she get the money and how was that arranged and carried out? A. Well, she asked me for it and I never refused her if I had the money.

"Q. How often did you give her money to buy clothes with? A. Whenever she wanted it.

"Q. About how often did that occur? A. Oh, I have an idea once a month, maybe.

"Q. What arrangements were made about buying the children's clothes? Did you buy them or she? A. She bought them.

"Q. Where did she get the money. A. I would give it to her.

"Q. What conversation did you have with her about that? A. She would tell me they needed this or that and I would give her the money to buy them with.

"Q. Did you dictate the amount that she was to pay for clothes? A. No, I never did."

It is not disputed that defendant purchased all food supplies for the family during the nine years of their married life, except the gift of one hundred dollars, part of which plaintiff claims paid a grocery bill, and of which defendant testified he had no knowledge.

The strongest inference to be drawn from the evidence in plaintiff's favor is that her father made her a present of one hundred dollars every Christmas during her married life, and that this money was expended by her in the purchase of things the family required. Plaintiff testified as to defendant's habits of industry, as follows:

"Q. What about his habits as to industry? A. Well, he was in my estimation a very unambitious person; besides that I did not leave him on account of that so much as because he was dishonest and I couldn't stand it."

It must be held a lack of industry may not be held to be an actionable indignity. The testimony shows, and this is not disputed, that defendant had not lost a day's work during their married life; that he arose from 2:30 to 4:00 o'clock every morning and worked at his business. We are unable to find in this respect any dereliction of duty on the part of defendant. All that has been proved against him is that he was unable to furnish a style and manner of living for his family beyond his means. We therefore rule that plaintiff has failed to establish her first charge of indignity.

The next specific allegation of indignity is that plaintiff was required to do such work as to undermine her health; and in support of this charge plaintiff testified she hauled manure in a wheelbarrow from the barn, assisted by her two older children. But the record fails to show plaintiff was required by defendant, or even requested to do this work. Defendant testified if plaintiff did this he knew nothing of it. Other witness employed at the dairy also testified if plaintiff and the children did this, they never knew it. The testi-

mony shows that during the month in which the manure is alleged to have been moved, the parties were living in a four-room house; that no chickens were raised or handled; they had no garden; the laundry work was done elsewhere; that neither the health of plaintiff nor any of the children was such as to require a physician after the birth of the youngest child. Plaintiff also testified she washed milk cans and bottles, but she did not testify she was required by defendant to do this. We rule this charge of indignity is not supported by the evidence.

The remaining charge of indignity is that defendant "has done nothing to assist in the care of the children and she and they have always been supported by plaintiff's father." What we have already said determines this point against plaintiff, as being unsupported, unless by the testimony of plaintiff to the effect that defendant would go hunting at night with his dogs and leave plaintiff at home with the children, or, perhaps on one or two occasions the children were left in the care of an employee on the farm. Plaintiff's testimony was to the effect that when she was left alone with the children she was frightened, and that she did not want them left alone with an employee; that it was not proper. The proof offered is not sufficient to establish an indignity in this respect. In her testimony plaintiff accuses defendant of a number of things which caused her humiliation, amounting to mental cruelty, which rendered her life intolerable. (1) That defendant had made a false claim against the Campbell Baking Company for the death of a cow which, instead of being killed, was only crippled, and that defendant collected one hundred dollars or one hundred twenty-five dollars for its death; (2) that plaintiff induced a boy in his employ in 1928 or 1929, to steal some corn from the field of a neighbor; and (3) that defendant induced Roy Eib, another employee, in February, 1930, to go to a neighbor's field and take some gasoline; (4) accused defendant of bringing home a wrench, a pair of scissors and some pliers which she charges he admitted he purloined. Referring to the incident of the cow and the settlement with the Baking Company, defendant testified the claim was settled on the basis of the injury to the cow, not for her death and that he never claimed the cow was killed. Defendant's testimony in this respect is fully corroborated by John Moore who made the settlement with the Baking Company, for defendant. We rule this charge is not substantiated.

As to the matter of taking corn from a neighbor's field by the boy employed by defendant, the latter positively denies the charge and states that at no time did he feed his cows anything but shelled corn. In this denial he is fully corroborated by the boy, Skaggs. This charge must be held not to have been proved. As to the question of the purloining of the gasoline, which proved to be kerosene, by the Eib boy, defendant testified he knew nothing of the circum-

stances until the morning following the night of its occurrence and when he learned of it, he required Eib to take the article back and replace it. In this statement defendant was corroborated by Eib. None of these charges by plaintiff is supported by corroborative evidence while the contrary is true of defendant's evidence in respect thereto. It was held in the case of Bassett v. Bassett, 280 S. W. 430, 436:

"We have scrupulously and scrutinously read, analyzed and weighed every bit of testimony in the record before us, and have been forced thereby to the inevitable conclusion that plaintiff has failed to establish any act or acts of indignity on defendant's part rendering his condition intolerable. In the first place, plaintiff's testimony lacks corroboration. As is well ruled in Scholl v. Scholl, 185 S. W. 765, 194 Mo. App. loc. cit. 566: 'Moreover, as said, the truth of these alleged acts rests for the most part on the uncorroborated testimony of plaintiff, and it has uniformly been held in divorce that one is rarely granted on the uncorroborated evidence of one of the parties.' "

See also Maget v. Maget, 85 Mo. App. 6; Magruder v. Magruder, 31 S. W. (2d) 213, 214. We hold the evidence does not preponderate in favor of plaintiff. It was held in the Esworthy case, supra, l. c. 1082:

"In a divorce case the party seeking the divorce must establish by a clear preponderance of the evidence that he or she is the innocent and injured party. It has been held that, where the evidence does not preponderate in favor of the plaintiff, the decree should be denied."

After due consideration of all the evidence, and having in mind the rule that due deference should be paid to the ruling of the trial court, we think the result reached by the court in this case does not comport with our conscience in the matter. It is our bounden duty to reverse the judgment. It is so ordered. *Bland, J.,* concurs; *Trimble, P. J.,* absent.