MARY D. LLEWELLYN, RESPONDENT, v. HENRY D. LLEWELLYN, APPELLANT.—88 S. W. (2d) 235.

Kansas City Court of Appeals. December 2, 1935.

*Homer E. Rich* for respondent.

*Clarence A. Barnes* for appellant.

TRIMBLE, J.—An action brought, June 19, 1934, by a wife to obtain a divorce. It was tried on November 26, 1934, and judgment

was rendered granting her the divorce with care and custody of the two children, both boys. In due time the husband filed motion for new trial which was overruled, and thereupon he appealed.

The petition alleged that the parties were lawfully married in Mexico, Missouri, on October 11, 1919, and lived together until about the —— day of September, 1931. After the usual allegations that plaintiff faithfully demeaned herself, discharged all her duties, and treated her husband with kindness and affection, the petition went on to allege that—"defendant wholly disregarding his duties as the husband of the plaintiff, did offer to her such indignities as did render her condition intolerable, in this, to-wit: several years ago the defendant began to use alcoholic beverages to excess to such an extent that his health and disposition were affected, he failed for some time prior to their separation to support this plaintiff and their two children, and for several months failed to furnish them with any support, and did not furnish them with a home, so that it became necessary for plaintiff to take her two children and go to live with her parents and for plaintiff to seek work wherever she could to make money to help support herself and her two children; that for several years the defendant has been given to outbursts of anger during which he would use abusive and indecent language toward the plaintiff, and would argue with her in an ugly manner over family affairs."

The answer was a general denial of everything in the petition, except the marriage and the birth of the two children, and prayed that the divorce be denied.

The court did not announce its findings concerning any of the evidence, but in its judgment recited that the court, "after hearing the evidence herein and the arguments of counsel, and being fully advised in the premises, doth find the issues for the plaintiff, and doth find that she is the innocent and injured party, and that she is entitled to the relief prayed for in her petition."

There were no witnesses, other than the parties themselves. The wife was sole witness on her behalf, and the husband the only witness on his side. This makes it unsatisfactory in arriving at a conclusion as to the real facts in the case, free from the personal bias of the one testifying, and often the plaintiff's testimony amounts to no more than mere conclusions stated in lieu of what are the unvarnished facts. While an appellate court should accord due weight to the conclusions reached by the trial judge but not of those stated by witnesses, yet it is nevertheless our duty to go over the record and decide for ourselves the *facts* as shown therein as in an equity suit. [McCann v. McCann, 91 Mo. App. 1; O'Hern v. O'Hern, 200 Mo. App. 651.]

The plaintiff's testimony in chief is that after they were married on October 11, 1919, at her home in Mexico, Missouri, they went to Marshall where the husband had a drug store which he was then

operating, he being a druggist. They lived there, at first, in the home provided by him, for ten years. He paid the rent for a while, but at last, in about 1927, he failed to pay it, and she borrowed the money and paid $200 of it. About that time, an apartment was fixed up over the drug store, he being the owner of the building, and they lived there for nine months.

She was asked by her counsel—

"Q. I will ask you if, on occasions, Mr. Llewellyn was in the habit of drinking intoxicating liquor? A. Yes, sir.

"Q. What would be his condition when he did that? A. He would be sick and had to go to bed.

"Q. Did that happen frequently? A. Yes, sir.

"Q. When did it begin? When did you first notice the influence of his intoxicating drink? A. I first knew what was the cause after five years. I didn't know what was causing it before.

"Q. In about what year did you first discover that? A. 1925.

"Q. I will ask you what his treatment of you would be when he was under the influence of liquor? A. Well, very indifferent and abusive language."

THE COURT: (To witness.)

"Q. Just what did he say? What terms did he use? A. I would hate to repeat the words.

"Q. Well, you will have to tell the court, Mrs. Llewellyn. That's the only way the court can determine. You said it was abusive and profane, but the court can decide, and you will have to tell the court. A. He used the word God-damn-son-of-a-bitch and everything he could think of.

"Q. Did he apply those terms to you that you have just spoken of? A. I was the only one on the premises. I suppose he did."

Defendant's counsel objected to the supposition and remarked:

"If he used that about some inanimate object, it wouldn't be grounds for a divorce."

THE COURT: (To witness.)

"Q. Just answer it directly. Did he? A. Yes, sir."

Plaintiff's counsel then asked about the number of their children, when they were born, and if they lived with their parents.

He later asked—

"Q. Did Mr. Llewellyn use the language you have just spoken to the court in their hearing and presence? A. Yes, sir.

"Q. Was that of frequent occurrence? A. Yes, sir."

Plaintiff's direct examination then went, or was directed to, the matter of her paying the $200 of the rent, theretofore mentioned in her testimony; also to the family moving upstairs over the drug store which, as well as the building, the husband owned, and of their living there for nine months. She testified that the store building

was finally sold; that, of the purchase money obtained, the husband paid her $500; that after the sale of the building they continued to stay in the upstairs for four months and then plaintiff went to Brookfield and spent the summer there. In the spring of 1927 they ceased living upstairs over the store, and during the next winter they had a two-room apartment and the following year, in 1929, she (presumably with the children); went to Mexico, Missouri, her husband remaining in Marshall. When asked if her husband contributed to her support while she was in Mexico, she answered, "Not at that time." When asked, did she go back to Marshall to visit him some and stay with him there, she answered—

"I didn't stay; I just visited him.

"Q. Where were the children at that time? A. When do you mean?

"Q. At the time you were living in Mexico and you went back to Marshall to visit, where were the children? A. No, I didn't visit him then. I never went back. He came down there.

"Q. He came to Mexico to see you? A. Yes.

"Q. Then did the whole family go to Mexico for a while? A. The following year he came down.

"Q. I will ask you if when he came to Mexico he—what his treatment of you would be with reference to intoxicating liquor? A. He would use abusive language and he had to sleep it off.

"Q. Did he use this same language in the presence of the children? A. Yes, sir.

"Q. Now, then, what time did you and Mr. Llewellyn finally separate after you lived together? A. 1931.

"Q. At that time where were you living? A. Mexico."

She then testified they lived in an apartment. He did not own a home there. And then for a year and a half they lived in an apartment which Mr. Llewellyn's sister owned and let them have. During this time her husband was not there all of the time, he was in Marshall part of the time, he was in Mexico just part of the time. It was in the second year when he came to Mexico.

In 1931, when she finally broke up the home in Mexico she went with the children to Brookfield to live with her parents who lived there and she has been living there ever since. When asked if Mr. Llewellyn had contributed to her support in that time, she replied: "Just occasionally sent a little bit."

"Q. Occasionally. As to amount, has he contributed any large proportion to your support? A. Why, no."

When her counsel asked her if her husband had given her "any reasonably large amount" for the support of the children, she answered "No" and that she had been supporting the children; that she had not seen "very much" of Mr. Llewellyn during the last four

years; that he has not come to see her "often" and has not been to see her at all during the last year and a half. *But she testified she had gone to see him*, and her counsel then asked—

"Q. Now, I will ask you if his treatment of you, as you have narrated from the stand, and his own habit of drinking *occasionally* (emphasis mine) has been of such a nature that you could not live with him as his wife? A. Absolutely."

Her direct examination then ceased and she was turned over to opposing counsel for cross-examination, and the first question he asked, was:—

"Q. Mrs. Llewellyn, as I understand, the only reason you couldn't live with your husband is because he drank? A. I don't know just what you mean.

"Q. I am just asking you that simple question. It is a very simple question. A. I would say, yes, sir."

Then she testified, under cross-examination, that before he married her in September, 1919, he had courted her for a couple of years, but she never knew, or had heard, that he took an occasional drink. Cross-examining counsel then asked:

"Q. And that was only an occasional drink, and he didn't take over one or two? If he takes two he becomes intoxicated, doesn't he? A. Yes, sir.

"Q. And sometimes he overindulges to the extent of taking two drinks. Now he is a member of a good family or you wouldn't have married him, isn't he? A. Of course.

"Q. When he was sober he was always kind and affectionate toward you, wasn't he? A. Yes, sir.

"Q. And you know that he has an abiding affection for you now, don't you? A. No.

"Q. You don't think so? A. No, sir.

"Q. He never gave you any occasion, except when he was in his cups, that he didn't have the utmost affection for you, did he? A. Lack of respect.

"Q. Lack of respect; hasn't he always treated you with respect as well as affection when he was sober? A. Not always.

"Q. Not always. You made no allegation of lack of respect in the petition, did you? How's that? A. It says the atmosphere of the home.

"Q. In the home he always respected you, didn't he? A. No.

"Q. What did he do? A. His language and deceiving me.

"Q. In what? A. Money matters.

"Q. You know that his character is above reproach, don't you? A. I don't know.

"Q. You never heard anything derogatory of his character, have you? He is one of the men that has as clear a record as anybody ever reared in Marshall, hasn't he? A. I don't know.

"Q. Well, you don't know anything to the contrary, do you? (No answer.)"

She then said he was a 32nd degree Mason, but she didn't know whether he took all those degrees with community support behind him. She said that when he married her she heard he had somewhere between $25,000 and $30,000 but she didn't know that of her own knowledge. He didn't lose that amount in the operation of the drug store in Mexico. When the attorney told her he did not mention that amount, but asked if her husband didn't lose some, she said she didn't know. When her cross-examiner asked, or inquiringly asserted, that she did know that, when they went to Marshall, her husband deposited $18,000 in the bank to go into business in Marshall, she replied, "That's what he said."

She admitted that he endeavored to "fit you out comfortably in a home," but when asked if he did not spend something like $3000 for furniture, she replied, "No, sir," and when asked what the amount for furniture was, she replied: "Including every tack and hammer in the house, about two thousand."

When they separated, she said he took a dresser, desk, chiffonier and some books, and she took just what she needed, and admitted she could get the rest of it any time she wanted it. She also testified that he owned a piece of business property in Mexico, Missouri, which he sold after he went to Marshall, and admitted that when he sold it, he gave her $1500 of the sale price and of this amount she still had $1400. She was asked if the depression did not begin to bear down heaviest on mercantile establishments about 1927. She replied, "I don't know."

"Q. You don't know anything about that. You lived as though there had been no depression at all? A. No, sir.

"Q. You didn't know about it? A. I lived economically all my life.

"Q. I don't mean that. I mean you continued to live in the home as though there had been no depression at all? A. I lived economically as I always had.

"Q. Of course, we all do. But you did it without any suggestion there was any depression on? A. No.

"Q. You did learn that your husband, outside of the two thousand dollars he had given you, that part of the eighteen thousand dollars, namely, sixteen thousand dollars, he lost in his business in Marshall? A. I suppose so.

"Q. Don't you know it of your own knowledge? A. It was gone.

"Q. And while they struggled with that, you were living over the store and his sister providing you with an apartment and all the conveniences there in Mexico? A. Yes, sir.

"Q. And his mother, in view of the economic condition to which he was reduced by virtue of the depression, offered to buy a home and install you in it and give it to you in your own name there in Mexico, if you wanted to?"

Mr. Rich: "I Object to that as coming from his mother and not Mr. Llewellyn at all."

Mr. Barnes: "That's his family."

The Court: "You may go ahead."

"Q. You declined to accept that home? A. I don't remember that.

"Q. Didn't she offer to buy a house for you from Charley Crisswell in the south side of town in a very acceptable neighborhood, and you said you didn't want it? Don't you recall that? A. I said things were not pleasant enough to live there. I wasn't going to stay.

"Q. So the home part of it had nothing to do with it at that time? A. I don't know.

"Q. I notice you allege a final separation in September, 1931; that isn't exactly an accurate statement, is it? A. Why not?

"Q. Four years ago next September? A. Yes, sir.

"Q. Why, haven't you cohabited with him since that time? A. I have been down there several times.

"Q. And on several occasions. Now, there had never been a time that Mr. Llewellyn has possessed any property, real or personal, or cash, that he hasn't done his utmost to support you and his family and furnish you with not only the necessities but some of the luxuries, is that true? And aren't you willing to tell the court now that when he had money, and when he was able to make any money, that he supplied you with ample funds, and did so in a generous way and without any bickering and without even asking for it? A. I asked for it."

She then denied, on cross-examination, that he sent her $160 "at one time" after she went to Brookfield. But in the answer to the next question she admitted he had sent her $80 at one time and $40 at another and that, all told, he had sent her "a little over two hundred dollars."

She admitted he was a registered pharmacist and an expert. And in answer to the question, since the depression if it had not been an exceedingly difficult job to get a position as a pharmacist, to which she merely answered, "He had two positions and didn't want them." But, when asked to name them she did so, and when asked what he was earning at one of them she said $10 a week, and when asked what was the "ordinary value of an expert pharmacist, if it wasn't from $250 to $300 a month," she said "No," and when asked what it was,

she said it was from $200 to $250. When asked if it wasn't out of the $40 a month that he had sent her the money at Brookfield, she said, "No;" and when asked where he got it, she said "he got a refund on a bridge proposition of forty-four dollars," and admitted that he sent that to her, but she didn't know where he got the rest of the money he sent her.

When asked if she didn't know that his physical condition wouldn't permit him to work from 8 A. M. till midnight, day in and day out, and that the drug store where he was when he stopped working "was violating the rules of the N. R. A. at that time," she merely said: "There wasn't no N. R. A. at that time." When told that the N. R. A. had been in effect a year and a half, she said it had been four years since he worked there. When asked if her husband was not working at this particular drug store a year from the past July, she said "No." As she had said, she was not in Mexico at that time, her cross-examiner said: "Q. Then you don't know it of your own knowledge? A. I know he was not there.

"Q. Where was he? A. I don't know. In Mexico, sitting around."

She said she knew he was steadily losing money in his store at Marshall, and that a man shouldn't become a little irritable when he had her to help him. When asked if she helped him in the store, she replied: "I stayed there." When asked as to her having first-hand knowledge of why the money was being lost, she answered: "Due to his dissipated habits is the reason."

"Q. You say that's what it is due to? A. Yes, sir.

"Q. Will you tell the court what he did? A. He wasn't capable of attending to business.

"Q. Over what period of time was that? A. The five years I knew of.

"Q. Five years continuously? A. Yes, sir.

"Q. And you have *condoned that a hundred times since then, haven't you?* (*No answer.*)

"Q. I asked you if you haven't condoned his intoxication and have lived with him since that time? Forgiven him? A. I was always forgiving; forgiving him."

After a redirect examination in which she was asked and answered only two questions, she was asked, on recross-examination, if there was ever any time, since she had gone to Brookfield, that she had asked him for money and he didn't send it. Her answer was that she had never asked for it. When asked when she first lost her affection for him, she said she lost her respect when she found out his habit ten years ago.

She was also asked—

"Q. When did you lose your affection for him, after you found out his habit? Before or after? A. After.

"Q. Do you remember when that was? A. No, just gradually.

"Q. Did you ever tell him you had lost your affection for him? A. Yes.

"Q. *When was that? A. I don't know.*

"Q. He always professed the greatest affection for you, did he not? (No answer.)"

It was then agreed, and stated to the court, that "there is no question about the good reputation and character of either of the parties."

Thereupon plaintiff rested.

Defendant, on direct examination, then testified he was a resident of Mexico, Missouri; that his father was in the drug business there for "a little over" fifty years, and, defendant was reared both in his father's home and in the business of handling drugs, and, is a registered pharmacist; that when he married he was worth between twenty-five thousand and thirty thousand dollars; he had inherited both the building and the drug business from his father, and when he bought the business at Marshall he took $18,000 in cash and deposited it in the bank there; that he put between $3500 and $3600 in furniture for the home for himself and wife, and endeavored to be liberal with his wife, never told her to "hold back" on buying anything if she wanted it, when he had the money. The business at Marshall did not prove profitable, not' because of any intoxicating liquor habits of his, the store had been a losing matter when he bought it, but he thought he could build it up. He made money for three or four years, after which the business stood still for about a year and then "commenced to lose money and lost steadily." When he left Marshall he did not have much money left. Where his money had gone was in losses in the business and for the support of his wife and children. He never got any part of it personally.

Defendant further stated he has always had a deep love and affection for the plaintiff and had same now, and the same was true as to the children. He swore he had never been an habitual drunkard for the space of one year at any time, nor at *any* time. He admitted he would take a drink or two but then would go on about his business; that he had always furnished his wife and children all the money it was possible for him to give, he gave them all he had "as long as I had it." And if he could have earned more he would have continued to give it to them, and did this since the "depression." He has made "a continuous effort" to obtain a position as a registered pharmacist. When he was absent from either Marshall or Mexico, he was endeavoring to find work. He has no money or property at all, having lost everything he had.

We think the plaintiff was very limited and reticent in her testimony, not being willing apparently to tell the court the circumstances, but contenting herself often with merely stating her conclusions about

the matter; and when forced to state the facts more fully, she did so grudgingly. Her testimony appears to us to fall far short of proving that her husband "has been addicted to habitual drunkenness for the space of one year" as the statute (Section 1350, Revised Statutes of Missouri, 1929) requires. And her charge of drinking seems to be her main complaint, though not specifically alleged as one of the grounds of divorce in her petition. As to the charge of indignities such as to render her condition intolerable, only one indignity is mentioned *definitely* told about, namely, the ugly name he used while in bed drunk, so she says. But this was denied by him; and this one she said she "supposed" referred to her but she did not explicitly say so until after she had been pressed about the matter; no doubt she herself realized that if it was not applied or addressed personally to her, it would not be worth anything as a ground of divorce. While this would be an indignity very grievous and hard to bear, and, if repeated, ought to be considered a cause of creating an intolerable condition, yet the courts hold that one indignity is not sufficient to authorize a divorce. [Johnston v. Johnston, 260 S. W. 770; Mahn v. Mahn, 70 Mo. App. 337; Kempf v. Kempf, 34 Mo. 211; England v. England, 39 S. W. (2d) 429.]

But plaintiff's own admissions show that she did not at the time regard her condition as intolerable, or if she did, it is certain that she condoned the offense.

The parties are admitted to be of good character and reputation. Hence, in view of all the circumstances, plaintiff did not sustain the necessary burden of proof. [Nolker v. Nolker, 208 S. W. 128.] Obtaining a divorce is a very serious business, something that others, including the State, are deeply interested in, besides the immediate parties. If defendant was guilty of all the things charged in this unsatisfactory way, it would have been an easy matter to have proved them by disinterested witnesses. There was absolutely no proof that the use of intoxicants had been such that defendant's health and disposition were affected thereby.

Under all the circumstances, we do not think that enough has been shown to entitle plaintiff to a divorce; and that in view of all the evidence in the case, it should not have been granted. The judgment is, therefore, reversed. All concur.